# MEMPHIS LIGHT, GAS & WATER DIVISION ET AL. *v.* CRAFT ET AL.

No. 76–39.   Argued November 2, 1977—Decided May 1, 1978

1

POWELL, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 22.

*Frierson M. Graves, Jr.,* argued the cause and filed a brief for petitioners.

*Thomas M. Daniel* argued the cause for respondents. With him on the brief were *Elliot Taubman* and *Bruce Mayor.**

MR. JUSTICE POWELL delivered the opinion of the Court.

This is an action brought under 42 U. S. C. § 1983 by home-owners in Memphis, Tenn., seeking declaratory and injunctive relief and damages against a municipal utility and several of its officers and employees for termination of utility service allegedly without due process of law. The District Court determined that respondents' claim of entitlement to continued utility service did not implicate a "property" interest protected by the Fourteenth Amendment, and that, in any event, the utility's termination procedures comported with due process. The Court of Appeals reversed in part. We granted certiorari to consider this constitutional question of importance in the operation of municipal utilities throughout the Nation.

## I

Memphis Light, Gas and Water Division (MLG&W) [1] is a division of the city of Memphis which provides utility service.

---

*David Sive* filed a brief for the National Council of the Churches of Christ as *amicus curiae*.

[1] Although MLG&W is listed as one of the petitioners, the District Court dismissed the action as to the utility itself because "a municipality or governmental unit standing in that capacity is not a 'person' within the meaning" of § 1983. Pet. for Cert. 43. The Court of Appeals did not

It is directed by a Board of Commissioners appointed by the City Council, and is subject to the ultimate control of the municipal government. As a municipal utility, MLG&W enjoys a statutory exemption from regulation by the state public service commission. Tenn. Code Ann. §§ 6–1306, 6–1317 (1971).

Willie S. and Mary Craft, respondents here,[2] reside at 1019 Alaska Street in Memphis. When the Crafts moved into their residence in October 1972, they noticed that there were two separate gas and electric meters and only one water meter serving the premises. The residence had been used previously as a duplex. The Crafts assumed, on the basis of information from the seller, that the second set of meters was inoperative.

In 1973, the Crafts began receiving two bills: their regular bill, and a second bill with an account number in the name of Willie *C.* Craft, as opposed to Willie *S.* Craft. Separate monthly bills were received for each set of meters, with a city service fee [3] appearing on each bill. In October 1973, after learning from a MLG&W meter reader that both sets of meters were running in their home, the Crafts hired a private plumber and electrical contractor to combine the meters into one gas and one electric meter. Because the contractor did not consolidate the meters properly, a condition of which the Crafts were not aware, they continued to receive two bills until Jan-

disturb that determination, and respondents have not sought review of the point in this Court. The individual petitioners, who are sued in both their official and personal capacities, are the utility's president and general manager, vice president, members of the Board of Commissioners, and two employees who have had responsibility for terminating utility services. They will be referred to throughout as either "MLG&W" or "petitioners."

[2] Of those who brought the original action, only the Crafts remain. The parties have not sought review in this Court of the rulings made below with respect to the other plaintiffs.

[3] The city service fee is a separate item on the regular utility bill, as required by municipal ordinance.

uary 1974. During this period, the Crafts' utility service was terminated five times for nonpayment.

On several occasions, Mrs. Craft missed work and went to the MLG&W offices in order to resolve the "double billing" problem. As found by the District Court, Mrs. Craft sought in good faith to determine the cause of the "double billing," but was unable to obtain a satisfactory explanation or any suggestion for further recourse from MLG&W employees. The court noted:

> "On one occasion when Mrs. Craft was attempting to avert a utilities termination, after final notice, she called the defendant's offices and explained that she had paid a bill, but was given no satisfaction. The procedure for an opportunity to talk with management was not adequately explained to Mrs. Craft, although she repeatedly tried to get some explanation for the problems of two bills and possible duplicate charges." Pet. for Cert. 38–39.

In February 1974, the Crafts and other MLG&W customers filed this action in the District Court for the Western District of Tennessee. After trial, the District Court refused to certify the plaintiffs' class and rendered judgment for the defendants. Although the court apparently was of the view that plaintiffs had no property interest in continued utility service while a disputed bill remained unpaid, it nevertheless addressed the procedural due process issue. It acknowledged that respondents had not been given adequate notice of a procedure for discussing the disputed bills with management, but concluded that "[n]one of the individual plaintiffs [was] deprived of [a] due process opportunity to be heard, nor did the circumstances indicate any substantial deprivation except in the possible instance of Mr. and Mrs. Craft." *Id.,* at 45.[4] The court

---

[4] The District Court's conclusion was advanced with little explanation, other than a reference to MLG&W's credit extension program. In an earlier discussion, the opinion offered a description of the utility's pro-

6

expressed "hope," "whether on the principles of [pendent] jurisdiction, or on the basis of a very limited possible denial of due process to Mr. and Mrs. Craft," that credit in the amount of $35 be issued to reimburse the Crafts for "duplicate and unnecessary charges made and expenses

---

cedures. First, the court listed the steps involved in a termination: (i) Approximately four days after a meter reading date, a bill is mailed to the service location or other address designated by the customer. The last day to pay the net amount would be approximately 20 days after the meter reading date. (ii) Approximately 24 days after the meters are read, a "final notice" is mailed stating that services will be disconnected within four days if no payment is received or other provision for payment is made. (iii) Electric service is then terminated by the meter reader, unless the customer assures him that payment is in the mail, shows a paid receipt, or explains that nonpayment was due to illness. If there is no communication prior to termination, the meter reader or serviceman is instructed to leave a cutoff notice giving information about restoration of service. (iv) Approximately five days after the electric service cutoff, the remaining services are terminated if the customer has not paid the bill or made other arrangements for payment. Pet. for Cert. 34–35.

The court also noted that on or about March 1, 1973, MLG&W instituted an "extended payment plan." This generous program allows customers able to demonstrate financial hardship to pay only one-half of a past due bill with the balance to be paid in equal installments over the next three bills. The plaintiffs in this action were participants in the plan. *Id.,* at 36.

Finally, the court observed that MLG&W provided a procedure for resolution of disputed bills:

"Credit counselors assist customers who have difficulty with payments or disputes concerning their bills with MLG&W. If those counselors cannot satisfy the customer, then the customer is referred to management personnel; generally the chief clerk in the department; then the supervisor in credit and collection. In addition, a dissatisfied customer may appeal to the Board of Commissioners of MLG&W as to complaints regarding bills, service, termination of service or any other matter relating to the operation of the Division. A customer may, if he so desires, be accompanied by an appropriate representative. The billing of customers, the determination as to when a final notice is sent, and the termination of service [are] governed by policies, rules and regulations adopted and approved by the Board of Commissioners of MLG&W." *Id.,* at 36–37.

incurred by [them] with respect to terminations which should have been unnecessary had effectual relief been afforded·them as requested." The court also recommended "that MLG&W in the future send a certified or registered mail notice of termination at least four days prior to termination," and that such notice "provide more specific information about customer service locations and personnel available to work out extended payment plans or adjustments of accounts in genuine hardships or appropriate situations." *Id.*, at 46–47.[5]

On appeal, the Court of Appeals for the Sixth Circuit affirmed the District Court's refusal to certify a class action, but held that the procedures accorded to the Crafts did not comport with due process. 534 F. 2d 684 (1976).

On July 12, 1976, petitioners sought a writ of certiorari in this Court to determine (i) whether the termination policies of a municipal utility constitute "state action" under the Fourteenth Amendment; (ii) if so, whether a municipal utility's termination of service for nonpayment deprives a customer of "property" within the meaning of the Due Process Clause; and (iii) assuming "state action" and a "property" interest, whether MLG&W's procedures afforded due process of law in this case.[6] On February 22, 1977, we granted certiorari. 429 U. S. 1090. We now affirm.

## II

There is, at the outset, a question of mootness. Although the parties have not addressed this question in their briefs, "they may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual

---

[5] In its order filed on December 30, 1974, the court acknowledged that defendants had issued the recommended credit and "instituted some new procedures which will give more definitive and adequate notice to customers of possible or impending cut-off of services." *Id.*, at 49. See n. 16, *infra.*

[6] Petitioners have abandoned their contention that "state action" is not present in this case. Brief for Petitioners 44.

'case or controversy,' *Richardson* v. *Ramirez,* 418 U. S. 24 (1974) . . . ." *Sosna* v. *Iowa,* 419 U. S. 393, 398 (1975).

As the case comes to us, the only remaining plaintiffs are respondents Willie S. and Mary Craft. Since the Court of Appeals affirmed the District Court's refusal to certify a class, the existence of a continuing "case or controversy" depends entirely on the claims of respondents. Cf. *Sosna* v. *Iowa, supra,* at 399, 402. It appears that respondents no longer desire a hearing to resolve a continuing dispute over their bills, as the double-meter problem has been clarified during this litigation.[7]   Nor do respondents aver that there is a present threat of termination of service. "An injunction can issue only after the plaintiff has established that the conduct sought to be enjoined is illegal and that the defendant, if not enjoined, will engage in such conduct." *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 584 (1971). Respondents insist, however, that the case is not moot because they seek damages and declaratory relief, and because the dispute that occasioned this suit is "capable of repetition, yet evading review." Tr. of Oral Arg. 45–46.

We need not decide whether this case falls within the special rule developed in *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498 (1911); see *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Roe* v. *Wade,* 410 U. S. 113, 125 (1973), to permit consideration of questions which, by their very nature, are not likely to survive the course of a normal litigation. Respondents' claim for actual and punitive damages arising from MLG&W's terminations of service saves this cause from the bar of mootness. Cf. *Powell* v. *McCormack,* 395 U. S. 486, 496–500 (1969). Although we express no opinion as to the

---

[7] "Not until after the action was filed were the Crafts able to discover that they continued to receive double computer billings because MLG&W failed to combine the two accounts properly (A. 146–150), or that, as a result of the double computer billings, MLG&W had overcharged them for gas service and city service fees." Brief for Respondents 5.

validity of respondents' claim for damages,[8] that claim is not so insubstantial or so clearly foreclosed by prior decisions that this case may not proceed.

## III

The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of "property" within the meaning of the Due Process Clause. Although the underlying substantive interest is created by "an independent source such as state law," federal constitutional law determines whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause. *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972); *Perry* v. *Sindermann,* 408 U. S. 593, 602 (1972).

The outcome of that inquiry is clear in this case. In defining a public utility's privilege to terminate for nonpayment of proper charges, Tennessee decisional law draws a line between utility bills that are the subject of a bona fide dispute and those that are not.

> "A company supplying electricity to the public has a right to cut off service to a customer for nonpayment of a just service bill and the company may adopt a rule to that effect. Annot., 112 A. L. R. 237 (1938). An excep-

---

[8] The District Court found that "[o]f the balance claimed by MLG&W in March, 1974, some involved possible gas overcharges and double or duplicate billings with respect to city service fees." Pet. for Cert. 39. Presumably, respondents also seek recovery for the loss of pay occasioned by Mrs. Craft's several visits to the offices of MLG&W "which should have been unnecessary had effectual relief been afforded them as requested." *Id.,* at 46.

While not urging mootness, petitioners assert that their compliance with the District Court's recommendation that a $35 credit be issued to the Crafts removes any claim for damages from this case. We do not understand the District Court's suggestion to have been an award of damages. The validity of the damages claim is a matter for initial determination by the courts below.

tion to the general rule exists when the customer has a bona fide dispute concerning the correctness of the bill. *Steele* v. *Clinton Electric Light & Power Co.*, 123 Conn. 180, 193 A. 613, 615 (1937); Annot., 112 A. L. R. 237, 241 (1938); see also 43 Am. Jur., Public Utilities and Services, Sec. 65; Annot., 28 A. L. R. 475 (1924). If the public utility discontinues service for nonpayment of a disputed amount it does so at its peril and if the public utility was wrong (e. g., customer overcharged), it is liable for damages. *Sims* v. *Alabama Water Co.*, 205 Ala. 378, 87 So. 688, 690, 28 A. L. R. 461 (1920)." *Trigg* v. *Middle Tennessee Electric Membership Corp.*, 533 S. W. 2d 730, 733 (Tenn. App. 1975), cert. denied (Tenn. Sup. Ct. Mar. 15, 1976).[9]

The *Trigg* court also rejected the utility's argument that plaintiffs had agreed to be bound by the utility's rules and regulations, which required payment whether or not a bill is received. "A public utility should not be able to coerce a customer to pay a disputed claim." *Ibid.*[10]

---

[9] Tennessee's formulation of a public utility's privilege to terminate service for nonpayment of an undisputed charge is in accord with the common-law rule. See generally 64 Am. Jur. 2d, Public Utilities §§ 63–64 (1972); Annot., 112 A. L. R. 237, 241 (1938); Note, The Duty of a Public Utility to Render Adequate Service: Its Scope and Enforcement, 62 Colum. L. Rev. 312, 326 (1962).

[10] Petitioners attempt to avoid the force of *Trigg* by referring to several Tennessee decisions which state the general rule that a utility may terminate service for nonpayment of undisputed charges or noncompliance with reasonable rules and regulations. These authorities, however, do not cast doubt upon the exception recognized in *Trigg* for a customer who tenders the undisputed amount, but withholds complete payment because of a bona fide dispute. See *Patterson* v. *Chattanooga*, 192 Tenn. 267, 241 S. W. 2d 291 (1951); *Farmer* v. *Nashville*, 127 Tenn. 509, 156 S. W. 189 (1913); *Jones* v. *Nashville*, 109 Tenn. 550, 72 S. W. 985 (1903); *Crumley* v. *Watauga Water Co.*, 99 Tenn. 420, 41 S. W. 1058 (1897); *Watauga Water Co.* v. *Wolfe*, 99 Tenn. 429, 41 S. W. 1060 (1897).

Petitioners also rely on *Lindsey* v. *Normet*, 405 U. S. 56 (1972). There,

State law does not permit a public utility to terminate service "at will." Cf. *Bishop* v. *Wood*, 426 U. S. 341, 345–347 (1976). MLG&W and other public utilities in Tennessee are obligated to provide service "to all of the inhabitants of the city of its location alike, without discrimination, and without denial, except for good and sufficient cause," *Farmer* v. *Nashville*, 127 Tenn. 509, 515, 156 S. W. 189, 190 (1913), and may not terminate service except "for nonpayment of a just service bill," *Trigg*, 533 S. W. 2d, at 733. An aggrieved customer may be able to enjoin a wrongful threat to terminate, or to bring a subsequent action for damages or a refund. *Ibid.* The availability of such local-law remedies is evidence of the State's recognition of a protected interest. Although the customer's right to continued service is conditioned upon payment of the charges properly due, "[t]he Fourteenth Amendment's protection of 'property' . . . has never been interpreted to safeguard only the rights of undisputed ownership." *Fuentes* v. *Shevin*, 407 U. S. 67, 86 (1972). Because petitioners may terminate service only "for cause," [11] respondents

the Court upheld an Oregon statute that required a tenant seeking a continuance of an eviction hearing to post security for accruing rent during the continuance, and limited the issues triable in an eviction proceeding to the questions of physical possession, forcible withholding, and legal right to possession. This reliance is misplaced. First, the Court merely held that the Oregon procedures comported with due process, without intimating that a tenant's claim to continued possession during a rent dispute failed to implicate a "property" interest. Second, "[t]he tenant did not have to post security in order to remain in possession before a hearing; rather, he had to post security only in order to obtain a *continuance* of the hearing. . . . [T]he tenant was not deprived of his possessory interest even for one day without opportunity for a hearing." *Fuentes* v. *Shevin*, 407 U. S. 67, 85 n. 15 (1972) (emphasis in original).

[11] In *Arnett* v. *Kennedy*, 416 U. S. 134 (1974), "the Court concluded that because the employee could only be discharged for cause, he had a property interest which was entitled to constitutional protection." *Bishop* v. *Wood*, 426 U. S. 341, 345 n. 8 (1976). See *Arnett* v. *Kennedy*, *supra*, at 166 (POWELL, J., concurring in part); cf. *Board of Regents* v. *Roth*, 408 U. S. 564, 578 (1972).

assert a "legitimate claim of entitlement" within the protection of the Due Process Clause.

## IV

In determining what process is "due" in this case, the extent of our inquiry is shaped by the ruling of the Court of Appeals. We need go no further in deciding this case than to ascertain whether the Court of Appeals properly read the Due Process Clause to require (i) notice informing the customer not only of the possibility of termination but also of a procedure for challenging a disputed bill, 534 F. 2d, at 688, and (ii) " '[an] established [procedure] for resolution of disputes' " or some specified avenue of relief for customers who "dispute the existence of the liability," id., at 689.[12]

---

[12] The Court of Appeals did refer to its earlier decision in *Palmer* v. *Columbia Gas of Ohio, Inc.*, 479 F. 2d 153 (1973), which approved a comprehensive remedy for a due process violation, including investigation of every communicated protest by a management official, provision of a hearing before such an official, and an opportunity to stay the termination upon the posting of an appropriate bond. *Id.*, at 159–160, 168–169. These procedures were fashioned in response to findings, based on uncontradicted evidence, of hostility and arrogance on the part of the collection-oriented clerical employees, *id.*, at 168. No such findings were made here, and the Court of Appeals' ruling did not purport to require a similar remedy in this case.

Respondents do request certain additional procedures: "an impartial decision maker," who may be a responsible company official; "the opportunity to present information and rebut the records presented"; and "a written decision," which apparently can be rendered after termination or payment. Tr. of Oral Arg. 28, 31; Brief for Respondents 31. As respondents have not cross-petitioned, cf. *Strunk* v. *United States*, 412 U. S. 434, 437 (1973), we do not decide whether—or under what circumstances—any of these additional procedures may be appropriate. We do note that the magnitude of the numbers of complaints of overcharge would be a relevant factor in determining the appropriateness of more formal procedures than we approve in this case. The resolution of a disputed bill normally presents a limited factual issue susceptible of informal resolution.

## A

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Central Hanover Trust Co.*, 339 U. S. 306, 314 (1950) (citations omitted). The issue here is whether due process requires that a municipal utility notify the customer of the availability of an avenue of redress within the organization should he wish to contest a particular charge.

The "final notice" contained in MLG&W's bills simply stated that payment was overdue and that service would be discontinued if payment was not made by a certain date. As the Court of Appeals determined, "the MLG&W notice only warn[ed] the customer to pay or face termination." 534 F. 2d, at 688–689. MLG&W also enclosed a "flyer" with the "final notice." One "flyer" was distributed to about 40% of the utility's customers, who resided in areas serviced by "credit counseling stations." It stated in part: "If you are having difficulty paying your utility bill, bring your bill to our neighborhood credit counselors for assistance. Your utility bills may be paid here also." No mention was made of a procedure for the disposition of a disputed claim. A different "flyer" went to customers in the remaining areas. It stated: "If you are having difficulty paying your utility bill and would like to discuss a utility payment plan, or if there is any dispute concerning the amount due, bring your bill to the office at . . . , or phone . . . ." *Id.*, at 688 n. 4.

The Court of Appeals noted that "there is no assurance that the Crafts were mailed the just mentioned flyer," *ibid.*, and implicitly affirmed the District Court's finding that Mrs. Craft was never apprised of the availability of a

procedure for discussing her dispute "with management." [13] The District Court's description of Mrs. Craft's repeated efforts to obtain information about what appeared to be unjustified double billing—"good faith efforts to pay for [the Crafts'] utilities as well as to straighten out the problem"—makes clear that she was not adequately notified of the procedures asserted to have been available at the time.[14]

Petitioners' notification procedure, while adequate to apprise the Crafts of the threat of termination of service, was not "reasonably calculated" to inform them of the availability of "an opportunity to present their objections" to their bills. *Mullane* v. *Central Hanover Trust Co., supra,* at 314. The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending "hearing." [15] Notice in a case of this kind

_____

[13] We do not understand the District Court's reference to "an opportunity to talk with management" as implying necessarily that Mrs. Craft should have been given an opportunity to discuss her bills with corporate officers of MLG&W. Rather, the point was that Mrs. Craft was not informed of the opportunity to meet with designated personnel who were duly authorized to review disputed bills with complaining customers and to correct any errors.

[14] Pet. for Cert. 39. William T. Mullen, secretary-treasurer of MLG&W, testified that the utility processed 33,000 "high bill" complaints in 1973. App. 130. He conceded, however, that no description of a dispute resolution process was ever distributed to the utility's customers, *id.,* at 162–163, 176, and there is no indication in the record that a written account of such a procedure was accessible to customers who had complaints about their bills. Mrs. Craft's case reveals that the opportunity to invoke that procedure, if it existed at all, depended on the vagaries of "word of mouth referral," *id.,* at 163.

[15] See, *e. g., Wolff* v. *McDonnell,* 418 U. S. 539, 564 (1974); *Morrissey* v. *Brewer,* 408 U. S. 471, 486–487 (1972); *In re Gault,* 387 U. S. 1, 33 (1967); *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 171–172 (1951) (Frankfurter, J., concurring).

The dissenting opinion of MR. JUSTICE STEVENS asserts that the Court's decision "trivializes" procedural due process. *Post,* at 22. While recognizing that other information would be "helpful," the dissent would hold

does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified. As no such notice was given respondents—despite "good faith efforts" on their part—they were deprived of the notice which was their due.[16]

that "a homeowner surely need not be told how to complain about an error in a utility bill . . . ." *Post*, at 26. In a different context a person threatened with the deprivation of a protected interest need not be told "how to complain." But the prior decisions of this Court make clear that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer, supra*, at 481; *Mathews* v. *Eldridge*, 424 U. S. 319, 334 (1976). In the particular circumstances of a threat to discontinue utility service, the homeowner should not be left in the plight described by the District Court in this case. Indeed, the dissent's view identifies the constitutional flaw in petitioners' notice procedure. The Crafts were told that unless the double bills were paid by a certain date their electricity would be cut off. But—as the Court of Appeals held—this skeletal notice did not advise them of a procedure for challenging the disputed bills. Such notice may well have been adequate under different circumstances. Here, however, the notice is given to thousands of customers of various levels of education, experience, and resources. Lay consumers of electric service, the uninterrupted continuity of which is essential to health and safety, should be informed clearly of the availability of an opportunity to present their complaint. In essence, recipients of a cutoff notice should be told where, during which hours of the day, and before whom disputed bills appropriately may be considered. The dissent's restrictive view of the process due in the context of this case would erect an artificial barrier between the notice and hearing components of the constitutional guarantee of due process.

[16] Petitioners have moved to clarify and regularize their notice procedure, and it is possible that the revised notice presently afforded may be entirely adequate. Developed in response to a suggestion made by the District Court, it lists "methods of contact" and states in part that trained "Credit Counselors are available to clear up any questions, discuss disputed bills or to make any needed adjustments. There are supervisors and other management personnel available if you are not satisfied with the answers or solutions given by the Credit Counselors." App. 193.

We also note that Tennessee law requires that the board of supervisors of each independent utility district, as opposed to a utility division of a

## B

This Court consistently has held that "some kind of hearing is required at some time before a person is finally deprived of his property interests." *Wolff* v. *McDonnell,* 418 U. S. 539, 557–558 (1974). We agree with the Court of Appeals that due process requires the provision of an opportunity for the presentation to a designated employee of a customer's complaint that he is being overcharged or charged for services not rendered.[17] Whether or not such a procedure may be available to other MLG&W customers, both courts below found that it was not made available to Mrs. Craft.[18] Petitioners have not made the requisite showing for overturning these "concurrent findings of fact by two courts below . . . ." *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275 (1949).[19]

---

municipality, "maintain a set of rules and regulations regarding the adjustment of all complaints which may be made to the district concerning . . . the adjustment of bills," and that such rules "be posted or otherwise available for convenient inspection by customers and members of the public in the offices of the district . . . ." Tenn. Code Ann. § 6–2618 (b) (Supp. 1977).

[17] "[A] hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal." *Londoner* v. *Denver,* 210 U. S. 373, 386 (1908). The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a "due process hearing" in appropriate circumstances. See, e. g., *Goss* v. *Lopez,* 419 U. S. 565, 581–584 (1975). See generally Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267 (1975).

[18] In *Goss* v. *Lopez, supra,* at 568 n. 2, and 583, the Court noted that an informal disciplinary procedure obtaining at the particular high school "was not followed in this case."

[19] The dissent advances its own reading of the record in this case, but offers no justification for sidestepping the determinations made below. There is no dispute that the District Court found that the "procedure for an opportunity to talk with management was not adequately explained to Mrs. Craft." See *post,* at 24 n. 6. The trial court also expressed a measure of disquietude over the treatment accorded Mrs. Craft when it sug-

Our decision in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), provides a framework of analysis for determining the "specific dictates of due process" in this case.

"[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the addi-

gested a credit to reimburse respondents for "duplicate and unnecessary charges made and expenses incurred by [them] with respect to terminations which should have been unnecessary had effectual relief been afforded them as requested." The Court of Appeals was even more explicit in its criticism of MLG&W's procedures. The very notices relied upon by the dissent, *post*, at 23, were found inadequate: "[T]he MLG&W notice fails to mention 'that a dispute concerning the amount due might be resolved through discussion with representatives of the company,'" 534 F. 2d 684, 688 (1976), and "only warns the customer to pay or face termination." *Id.*, at 688–689, and n. 4. And that the Court of Appeals found an absence of a constitutional hearing is the only sound way to read its statement that the utility "provides no avenue for customers who . . . dispute the existence of the liability (Crafts)." *Id.*, at 689.

These findings are not undermined, as the dissent suggests, by Mrs. Craft's ability ultimately to glean some understanding of her billing problem after several, time-consuming trips to MLG&W's office—in the District Court's words, after "she repeatedly tried to get some explanation for the problems of two bills and possible duplicate charges." Nor are they placed in question by the fact that an employee of uncertain authority told Mrs. Craft, apparently without explanation or attempt at investigation, "[w]ell, you have to pay on the other" bill. App. 91. Fundamental fairness, not simply considerations of "courteous" treatment of customers, *post*, at 25 n. 7, informs the constitutional requirement of notice and the actual provision of a timely opportunity to meet with designated personnel who are duly authorized to review disputed bills and to correct any errors.

tional or substitute procedural requirement would entail." *Id.*, at 334–335.

Under the balancing approach outlined in *Mathews,* some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential services. The customer's interest is self-evident. Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety. And the risk of an erroneous deprivation, given the necessary reliance on computers,[20] is not insubstantial.[21]

The utility's interests are not incompatible with affording the notice and procedure described above. Quite apart from its duty as a public service company, a utility—in its own business interests—may be expected to make all reasonable efforts to minimize billing errors and the resulting customer dissatisfaction and possible injury. Cf. *Goss* v. *Lopez,* 419 U. S. 565, 583 (1975). Nor should "some kind of hearing" prove burdensome. The opportunity for a meeting with a responsible employee empowered to resolve the dispute could be afforded well in advance of the scheduled date of termination.[22] And petitioners would retain the option to terminate

---

[20] In recent years Congress has been concerned by the problems of computer error. See, *e. g.,* S. Rep. No. 93–278, p. 5 (1973) (billing errors in consumer credit transactions); Senate Committee on Government Operations, Problems Associated with Computer Technology in Federal Programs and Private Industry: Computer Abuses, 94th Cong., 2d Sess. (Comm. Print 1976).

[21] See, *e. g., Palmer* v. *Columbia Gas of Ohio, Inc.,* 479 F. 2d, at 158; *Davis* v. *Weir,* 497 F. 2d 139, 142 (CA5 1974); *Bronson* v. *Consolidated Edison Co. of New York,* 350 F. Supp. 443, 448 n. 11 (SDNY 1972) (16% of the complaints investigated by New York Public Service Commission resulted in adjustments in favor of the customer).

[22] Because petitioners provide for at least a 30-day period between the mailing of the bill and the actual termination of service, Brief for Petitioners 28, it is unlikely that the informal procedure required in this case

service after affording this opportunity and concluding that the amount billed was justly due.

## C

Petitioners contend that the available common-law remedies of a pretermination injunction, a post-termination suit for damages, and post-payment action for a refund are sufficient to cure any perceived inadequacy in MLG&W's procedures.[23]

Ordinarily, due process of law requires an opportunity for "some kind of hearing" prior to the deprivation of a significant property interest. See *Boddie* v. *Connecticut*, 401 U. S. 371, 379 (1971). On occasion, this Court has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional "advance procedural safeguards," *Ingraham* v. *Wright,* 430 U. S. 651, 680 (1977); see *Mathews* v. *Eldridge, supra,* at 339–349.[24]

---

will occasion material delay in payment. The public utility enjoys a broad discretion in the scheduling and structuring of this "hearing," provided that the customer is afforded adequate time for effective presentation of his complaint prior to termination.

[23] This contention was advanced only obliquely in the Court of Appeals. Brief for Appellees in No. 75–1350 (CA6), p. 27.

[24] In *Ingraham,* the Court held that "advance procedural safeguards" were not constitutionally required in the context of disciplinary paddling in the schools because the ability of the teacher to observe directly the infraction in question, the openness of the school environment, the visibility of the confrontation to other students and faculty, and the likelihood of parental reaction to unreasonable punishment, gave assurance that "the risk that a child will be paddled without cause is typically insignificant." 430 U. S., at 677–678. Similarly, in *Dixon* v. *Love,* 431 U. S. 105, 113 (1977), we held that an evidentiary hearing need not precede revocation of a driver's license based on repeated traffic offenses within the previous 10-year period, for "appellee had the opportunity for a full judicial hearing

The factors that have justified exceptions to the requirement of some prior process are not present here. Although utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation. Cf. *Stanley* v. *Illinois,* 405 U. S. 645, 647–648 (1972). Moreover, the probability of error in utility cutoff decisions is not so insubstantial as to warrant dispensing with all process prior to termination.[25]

The injunction remedy referred to by petitioners would not be an adequate substitute for a pretermination review of the disputed bill with a designated employee. Many of the Court's decisions in this area have required additional procedures to further due process, notwithstanding the apparent availability of injunctive relief or recovery provisions. It was thought that such remedies were likely to be too bounded by procedural constraints and too susceptible of delay to provide an effective safeguard against an erroneous deprivation.[26] These considerations are applicable in the utility termination context.

---

in connection with each of the traffic convictions on which the . . . decision was based."

[25] Petitioners assert that they are under an obligation to provide nondiscriminatory service to their customers, and that continued provision of service to a delinquent customer pending an informal hearing would involve "discriminating against the ratepayer . . . ." Tr. of Oral Arg. 5.

It is far from clear that any material delay in payment will occur from an informal conference that can be scheduled well in advance of the date of termination, see n. 22, *supra.* In any event, as is demonstrated by MLG&W's credit plan, see n. 4, *supra,* delayed payment is not nonpayment, and there are means available to MLG&W to recover at least some of the costs of a hearing, see, *e. g.,* App. 114, 117 (imposition of gross, rather than net, charges for late payment).

[26] See, *e. g., Goss* v. *Lopez,* 419 U. S., at 581–582, n. 10; *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601, 603, 607 (1975); *Fuentes* v. *Shevin,* 407 U. S., at 85, and n. 15; *Sniadach* v. *Family Finance*

Equitable remedies are particularly unsuited to the resolution of factual disputes typically involving sums of money too small to justify engaging counsel or bringing a lawsuit.[27] An action in equity to halt an improper termination, because it is less likely to be pursued [28] and less likely to be effective, even if pursued, will not provide the same assurance of accurate decisionmaking as would an adequate administrative procedure. In these circumstances, an informal administrative

_Corp._, 395 U. S. 337, 343 (1969) (Harlan, J., concurring); _Bell_ v. _Burson_, 402 U. S. 535, 536 (1971).

The dissent intimates that due process was satisfied in this case because "a customer can always avoid termination by the simple expedient of paying the disputed bill and claiming a refund . . . ." _Post_, at 28. This point ignores the predicament confronting many individuals who lack the means to pay additional, unanticipated utility expenses. Even under MLG&W's admirable credit procedures, the customer must make immediate payment of one-half of a disputed past due bill, with the balance to be paid in three equal installments, in addition to current charges. Contrary to the dissent's suggestion, this Court's decision in _Lindsey_ v. _Normet_, 405 U. S. 56 (1972), did not uphold a procedure that conditioned a tenant's continued possession on payment of "the back rent, an obligation which he disputed." _Post_, at 29 n. 11. Under the procedure upheld in _Lindsey_, certain tenant defenses were excluded, but the landlord still had to prove nonpayment of rent due or a holding contrary to some covenant in the lease before the tenant could be deprived of possession. See 405 U. S., at 65; n. 10, _supra_.

[27] This understanding informs the common-law privilege of the utility to terminate service for nonpayment of just charges. "An obvious reason [for the privilege] is that to limit the remedy of collection of compensation for the service to actions at law would be impracticable, as leading to an infinite number of actions to collect very small bills against scattered consumers, many of them mere renters and financially irresponsible." _Steele_ v. _Clinton Electric Light & Power Co._, 123 Conn. 180, 184, 193 A. 613, 615 (1937); see _Jones_ v. _Nashville_, 109 Tenn., at 560, 72 S. W., at 987.

[28] As early as 1874, the Wisconsin Supreme Court held that the State Attorney General could obtain an injunction against a public utility threatening a wrongful termination because private persons would be unlikely to take action themselves to correct "the little wrongs which go so far to make up the measure of average prosperity of life." _Attorney General_ v. _Chicago & N. W. R. Co._, 35 Wis. 425, 530–531.

remedy, along the lines suggested above, constitutes the process that is "due."

## V

Because of the failure to provide notice reasonably calculated to apprise respondents of the availability of an administrative procedure to consider their complaint of erroneous billing, and the failure to afford them an opportunity to present their complaint to a designated employee empowered to review disputed bills and rectify error, petitioners deprived respondents of an interest in property without due process of law.

The judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Stevens, with whom The Chief Justice and Mr. Justice Rehnquist join, dissenting.

In my judgment, the Court's holding confuses and trivializes the principle that the State may not deprive any person of life, liberty, or property without due process of law. I have no quarrel with the Court's conclusion that as a matter of Tennessee law a customer has a legitimate claim of entitlement to continued utility services as long as the undisputed portions of his utility bills are paid. For that reason, a municipality may not terminate utility service without giving the customer a fair opportunity to avoid termination either by paying the bill or questioning its accuracy. I do not agree, however, that this record discloses any constitutional defect in the termination procedures employed by the Light, Gas and Water Division of the city of Memphis (Division).

The Court focuses on two aspects of the Division's collection procedures. First, according to the Court, the Division's standard form of termination notice did not adequately inform the customer of the availability of a procedure for protesting a proposed termination of service as unjustified. *Ante,* at 15. Second, the Division did not afford its customers an adequate

opportunity to meet with an employee who had the authority to settle billing disputes. *Ante,* at 18. Whether we consider the evidence describing the unusual dispute between the Crafts and the Division, or the evidence concerning the general operation of the Division's collection procedures, I find no basis for concluding that either of the Court's criticisms is justified; its conclusion that a constitutional violation has been proved is truly extraordinary.

Although the details of the dispute between the Crafts and the Division are obscure, the record describes the Division's customary practices in some detail. Each month the Division terminates the service of about 2,000 customers.[1] Terminations.are preceded by a written notice advising the customer of the date by which payment must be made to avoid a cutoff and requesting the customer to contact the credit and collections department if he is having difficulty paying the bill.[2] The notices contain a prominent legend: [3]

"PHONE 523–0711
INFORMATION CENTER"

Calls to the listed phone number are answered by 30 or 40 Division employees, all of whom are empowered to delay cutoffs for three days based on representations made by customers over the phone. These employees also direct callers to credit counselors who are authorized to resolve disputes on a more permanent basis and who can set up extended payment plans for customers in financial difficulty.[4]

---

[1] During the six months from September 1973 through February 1974, there were 11,216 so-called delinquent cutoffs. App. 74.

[2] The request to contact the credit department is contained in an enclosed "flyer" which also identifies the appropriate neighborhood location to be visited for credit assistance.

[3] See 534 F. 2d 684, 688 (CA6 1976).

[4] App. 126 and 161. Information center employees may also refer customers who complain about a high bill to a special unit that sends investigators to check for possible leaks or defects in the meter. *Id.,* at 178.

The District Court did not find that the Division's notice was defective in any respect or that its regular practices were not adequate to handle the Crafts' unusual problems. The Crafts' dispute with the Division stemmed from the use of two sets of meters to measure utility consumption in different parts of the Crafts' home. *Ante,* at 4. The Crafts, believing they were being billed twice for the same utilities, did not pay on the second account. In fact, the two accounts were independent; because the Crafts refused to pay the balance on the second account, the Division terminated their service on several occasions.[5] The District Court expressly found that the Division sent a final notice before each termination.

The District Court did not find that Mrs. Craft was unable to meet with credit department personnel possessing adequate authority to make an adjustment in her bill.[6] She was successful in working out a deferred-payment arrangement but apparently was unable to have the amount of the bills reduced. The record therefore indicates that Mrs. Craft did meet with

---

[5] The trial judge evidently accepted the Division's claim that it was engaged in "split billing" rather than "double billing." The judge did express the "hope," as a matter of "simple equity," that the Division would issue a credit of $35 to cover duplicate and unnecessary charges and expenses incurred with respect to termination, but the amounts challenged by the Crafts as the result of "double billing" were considerably larger than $35. The reference to duplicate charges apparently concerns the $2.50 per month city service fee which was charged on each set of meters in the duplex until after they were consolidated. The unnecessary expense reference apparently covers both the time lost from work while Mrs. Craft was trying to straighten out their billing and the cost attributable to the termination. The District Court appears to have been persuaded that those costs could have been avoided if the Crafts had been given more help in the early stages of their dispute.

[6] The District Court stated that the "procedure for an opportunity to talk with the management was not adequately explained to Mrs. Craft." The District Court was evaluating the Division's explanation of its procedures; the court's statement does not mean that Mrs. Craft never met with a responsible official able to resolve her dispute.

Division employees having adequate authority but simply failed to persuade any of them that there was any error in her bills.[7]

## I

The Court's constitutional objection to the Division's notice rests entirely on the classic statement from *Mullane* v. *Central Hanover Trust Co.*, 339 U. S. 306, 314:

> "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

That statement identifies the two essential characteristics of adequate notice: It must inform the recipient of the impending loss; and it must be given in time to afford the recipient an opportunity to defend. These essentials must, of course, be expressed in terms which the layman can understand. The Division's notice unquestionably satisfied these two basic requirements.[8]

No doubt there may be situations in which these two essen-

---

[7] It is worth remembering that the Crafts' double-billing problem was eventually solved, and that the solution could only have been effected by a Division employee empowered to do so. Moreover, Mrs. Craft testified on direct examination that after being cut off she went to the Division's office with the record of her payments on one account. She was told that she had to pay on the other account as well. *Id.*, at 91. In other words, an official of the Division *did* resolve the Crafts' dispute, correctly as it turned out. See n. 5, *supra.* The Division's procedures would not be unconstitutional even if we assumed that Division employees, like federal judges, are occasionally discourteous and occasionally make mistakes. The Due Process Clause does not guarantee a correct or a courteous resolution of every dispute.

[8] It tells the customer that a cutoff is imminent and it allows the customer enough time to avoid a cutoff by paying under protest, by contacting the information center, or by beginning a legal action.

tials would not be sufficient to constitute fair notice. For example, if the notice describes a threatened loss which can only follow a prescheduled hearing, it must also inform the recipient of the time and place of the hearing. But I do not understand the Court to require municipal utilities to schedule a hearing before each termination notice is mailed. The Court seems to assume, as I do, that no hearing of any kind is necessary unless the customer has reason to believe he has been overcharged. Such a customer may protest his bill in either of two ways: He may communicate directly with the utility, or he may seek relief in court. In this case the Court finds the Division's notice constitutionally defective because it does not describe the former alternative.

The Division must "advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified." *Ante,* at 15. That advice is much less valuable to the customer than an explanation of the legal remedies that are available if a wrongful termination should occur. Yet the Court wisely avoids holding that the customer must be given that sort of legal advice. The advice the Court does require is wholly unnecessary in all but the most unusual situations. For a homeowner surely need not be told how to complain about an error in a utility bill; it is, of course, helpful to include the telephone number and office address in the termination notice, but our democratic government would cease to function if, as the Court seems to assume, our citizenry were unable to find such information on their own initiative. The Court's holding that the Division's notice was constitutionally defective rests on a paternalistic predicate that I cannot accept.

Even accepting the Court's predicate, a notice which advises customers to call the "information center" should be adequate; if not, it seems clear that advising customers to call, during normal business hours, a "dispute resolution center" manned by the same personnel would cure the constitu-

tional objection. Distinctions of this small magnitude are the appropriate concern of administrative rulemaking; they are too trivial to identify constitutional error.

## II

The Court's pronouncement "that due process requires the provision of an opportunity for the presentation to a designated employee of a customer's complaint that he is being overcharged or charged for services not rendered," *ante,* at 16, is equally divorced from the facts of this case. The Division processes more than 30,000 complaints of excess charges each year, and it has designated scores of employees to hear and investigate those complaints. Except for the Crafts' troubles, there is nothing in the record to suggest that the Division's customers are denied access to these employees, or that the employees lack the power to deal appropriately with meritorious complaints. Indeed, as already noted, there is no finding by either of the courts below that the Crafts themselves did not meet with responsible officials empowered to resolve their dispute.[9]

Although the Court's pronouncement in this case is therefore gratuitous, it cannot be dismissed as harmless. For it warns municipal utilities that unless they provide "some kind of hearing," *ibid.,* they may be acting unconstitutionally. Just what, or why, additional procedural safeguards are constitutionally required is most difficult to discern.[10]

---

[9] See nn. 6 and 7, *supra.*

[10] A careful reading of the decision below and this Court's decision indicates that the Court has modified as well as affirmed the Sixth Circuit's view of procedural due process in a utility context. The Court of Appeals thought that this case was controlled by its earlier decision in *Palmer* v. *Columbia Gas of Ohio, Inc.,* 479 F. 2d 153 (1973). *Palmer* ordered that cutoff notices be delivered personally by utility servicemen or sent by certified mail, return receipt requested. *Id.,* at 159 and 166–167. The notice had to tell customers about available credit programs as well as possible dispute-resolving procedures. *Ibid.* The *Palmer* court also specified that

In deciding that more process is due, the Court relies on two quite different hypothetical considerations. First, the Court stresses the fact that disconnection of water or heating "may threaten health and safety." *Ante,* at 18. Second, the Court discounts the value of the protection afforded by the available judicial remedies because the "factual disputes typically [involve] sums of money too small to justify engaging counsel or bringing a lawsuit." *Ante,* at 21. Neither of these examples is disclosed by this record. The Crafts' dispute involved only a relatively small amount, but they did obtain counsel and thereafter they encountered no billing problems.

Although the Division's terminations number about 2,000 each month, the record does not reveal any actual case of harm to health or safety. The District Court found that the Division does not discontinue service when there is illness in a home. Since a customer can always avoid termination by the simple expedient of paying the disputed bill and claiming a refund,[11] it is not surprising that the real emergency case is

---

the utility's hearing officer had to send—by certified mail—a written, individual response to every complaining customer before authorizing a cutoff. *Id.,* at 159–160, n. 9, and 167–169. Although the Division's failure to observe these procedures was the foundation of the Court of Appeals' ruling below, the Court quite clearly does not approve the lower court's view that these procedures are constitutionally mandated.

[11] If there is no constitutional objection to requiring a tenant to pay a disputed charge in order to retain possession of his home, I do not understand why there should be a more serious objection to requiring payment of a lesser charge in order to retain utility service. In *Lindsey* v. *Normet,* 405 U. S. 56, a tenant sought to defend a possessory action brought by his landlord for nonpayment of rent on the ground that the premises were uninhabitable and therefore there was no obligation to pay the rent. State law did not permit such a defense in a possessory action. In order to litigate that particular dispute, the tenant had to bring his own action against the landlord. If the tenant had not in fact paid the disputed rent, the landlord would prevail in the possessory action. Thus, in order to retain possession while litigating the dispute, the tenant not only had to pay the accruing rent (a requirement upheld in *Lindsey, supra,* at 65),

rare, if indeed it exists at all.[12]   When a true emergency does present a serious threat to health or safety, the customer will have ample motivation to take the important step of consulting counsel or filing suit even if the amount of his disputed bill is small.   A potential loss of utility service sufficiently grievous to qualify as a constitutional deprivation can hardly be too petty to justify invoking the aid of counsel or the judiciary.   Conversely, routine billing disputes too petty for the bench or the bar can hardly merit extraordinary constitutional protection.

Even if the customer does not consult counsel in a specific case, the potential damages remedy nevertheless provides far more significant protection against an unjustified termination than does the vague requirement of "some kind of hearing." Without the threat of damages liability for mistakes, the informal procedures required today would neither qualify the utility's ultimate power to enforce collection by terminating service nor deter the exercise of that power.   On the other hand, even without specific informal procedures, the danger of substantial liability will by itself ensure careful attention to genuine customer disputes.   The utility's potential liability therefore provides customers with real pretermination protection even though damages may not be recovered until later.

The need for a procedural innovation is not demonstrated

---

but also had to pay the back rent, an obligation which he disputed.   If he did not pay the back rent, he would lose in the possessory action and therefore would lose possession while he was prosecuting his own suit against the landlord.   Thus, the Court sustained a procedure which required the payment of a disputed charge in order to maintain the status quo while litigating the dispute.

[12] Even the customer who is unable to pay his bill in full may forestall termination by a partial payment.   *Ante*, at 5–6, n. 4.   Perhaps this Court fashions its rule for the benefit of those customers who are unable to make even a partial payment.   But if such persons cannot pay current, undisputed bills, their service may be terminated despite a bona fide dispute over a past bill; for no one has a constitutional right to free utility service.

by the record in this judicial proceeding, but rather is justified on the basis of hypothetical examples, information gleaned from cases not before us, and legislative reports. See *ante,* at 18 nn. 20 and 21. These justifications suggest that the Court's new rule is the product of a policy determination rather than a traditional construction of the Constitution. As judges we have experience in appraising the fairness of legal remedies and judicial proceedings, but we have no similar ability to balance the cost of scheduling thousands of billing conferences against the benefit of providing additional protection to the occasional customer who may be unable to forestall an unjustified termination.

It is an unfortunate fact that when the State assesses taxes or operates a utility, it occasionally overcharges the citizen. It is also unfortunate that effective collection procedures sometimes require the citizen to pay an unjust charge in order to forestall a serious deprivation of property. But if the State has given the citizen fair notice and afforded him procedural redress which is entirely adequate when invoked by his lawyer, the demands of the Due Process Clause are satisfied. I do not believe the Constitution requires the State to employ procedures that are so simple that every lay person can always act effectively without the assistance of counsel.

I respectfully dissent.