IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of | No. 82688-3-I |
| K.H. | DIVISION ONE |
| | UNPUBLISHED OPINION |

COBURN, J. — K.H. challenges a 14-day involuntary commitment order based upon the grounds that she posed a substantial risk of harm to others, and others' property, and was gravely disabled. K.H. contends that her due process rights were violated because the State did not provide formal notice of the facts relied upon to support three of the four reasons justifying the commitment. The challenged testimony related to laboratory results and K.H.'s mother's testimony relating to harm to others and others' property. K.H. did not object to the laboratory results. Sufficient evidence supports all the grounds for commitment even without the challenged portion of the mother's testimony. The commitment may be based on the single basis K.H. does not challenge. Even if we were to find error, such error was harmless. We affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In April 2021, K.H.'s mother brought her to the emergency department at Valley Medical Center because she was concerned about her state of mind and living conditions. K.H. voluntarily agreed to psychiatric hospitalization at Cascade Behavioral Health Hospital (Cascade). After the transfer to Cascade, K.H. attempted to elope[1], but was not permitted to do so because the staff members observed that she was agitated and uncooperative, as well as displaying "aggression, disorganized and paranoid thoughts with poor insight into her current condition." The day after admission to Cascade, a designated crisis responder filed an initial petition of detention alleging that K.H. presented an imminent risk of harm to her health and safety and was gravely disabled. K.H. was then detained under the Involuntary Treatment Act (ITA), chapter 71.05 RCW.

On April 13, Cascade filed a petition requesting K.H. be committed for a 14-day involuntary commitment. The petition alleged that K.H. was gravely disabled as a result of a mental disorder and was in danger of serious physical harm. The petition explained the facts supporting the finding as follows:

> [K.H.] suffers from a mental illness and has a history of at least 1 ITA detentions [sic] prior to her current admission. [K.H.] agreed to voluntary hospitalization at Cascade, due to vague suicidal ideations, paranoia, delusions, and auditory and visual hallucinations. When under voluntary admission, [K.H.] attempted to elope on more than one occasion, and was noted to be disorganized, verbally aggressive to the point that a show of

---

[1] Eloping refers to running or slipping away from a mental institution setting.

support by staff was called, agitated, and uncooperative. Additionally, respondent was noted to have mumbled and incoherent speech, refusing medications, impulsive behaviors, and on-going psychosis. Since moving to involuntary detention at Cascade Behavioral Health, she remains symptomatic and continued inpatient psychiatric hospitalization is required to stabilize her functioning.

The State amended the petition adding another basis for commitment as a result of K.H.'s mental disorder: "a likelihood of serious harm to others and/or others' property." The supporting facts also were amended adding "[K.H.] has twice attempted to elope since her ITA admission and during the most recent attempt caused a secure door to crack as a result of her kicking and pushing against it." The State soon after notified defense counsel that K.H. also had to be restrained by several people that morning because K.H. tried to elope again, and one of the doctor's fingers got cut. K.H. waived her appearance at the probable cause hearing held that same day.

The State told the superior court commissioner pro tem that it was seeking K.H.'s commitment through four statutory grounds—substantial risk of harm to another person, substantial risk of harm to others' property, and grave disability under both prongs (a) and (b) of RCW 71.05.020(24).

At the beginning of the hearing, the State announced the witnesses it intended to call, including K.H.'s mother. K.H. did not object.

Cascade employee Erika Zimmerman testified as to K.H.'s various incidents at the hospital beginning April 8. She stated that when she responded to a code gray, which is the code for a combative person, K.H. was "agitated, loud, profane, refusing to follow directions" and "appeared confused." She also

responded to an incident on April 14, when K.H. eloped from her unit and remained by the elevators. She again appeared agitated, loud, and profane, and swung a notebook at staff but did not make contact. The following day, Zimmerman responded to a similar incident in which K.H. had eloped from her unit, and when she was taken back into her unit, she kicked and cracked a wooden door.

The commissioner then heard testimony from K.H.'s mother. The mother testified that over the last eight or nine months that she had been visiting K.H. every day because she was "greatly concerned about her state of mind and her living conditions and the things that are happening around her." The mother testified that she found K.H. in her bed "underneath all kind of clothes, not speaking," and the house appeared to be "tor[n] up." The mother described the kitchen as disorganized and unsanitary with the tub being filled with toilet paper and water and the toilet full of "waste." The mother encouraged K.H. to leave the residence because it had become unlivable but K.H. refused. Later, the mother convinced K.H. to check herself into the hospital.

The mother recounted that one time when she went over to K.H.'s residence to talk to her, K.H. became upset and threw a bowl of milk into and at the mother's car. The mother feared K.H. was going to physically attack her. The mother also testified that K.H. had recently cut holes in the walls of her property, noting that K.H. has previously cut holes in the walls because she thought something was in the ceiling.

4

After the mother finished her testimony and was excused by the commissioner, K.H.'s counsel moved to strike her testimony because counsel alleged he received no notice of the facts the mother testified to relating to harm to property (the holes cut in the wall) and harm to others (the milk being thrown at the mother's car). The commissioner denied the motion because counsel knew the mother was listed as one of the witnesses for the hearing, had the ability to interview the mother before the hearing, and cross-examined her during the hearing. K.H. did not request a continuance.

Next, Hyemin Song, a court evaluator at Valley Medical Center, testified to K.H.'s laboratory results. She testified that K.H.'s urinalysis was concerning for a urinary tract infection and showed traces of ketones, and her chemistry panel was noted for hypokalemia, which is a potassium deficiency. Dr. Robert Beattey, a clinical psychologist and court evaluator for Cascade, testified that the hypokalemia and ketones in urine may suggest malnutrition. Her urine drug screen was also positive for amphetamines and cocaine.

Beattey also testified to his opinions on K.H.'s mental state and its implications. He opined that based on reports and his observations that K.H. had schizoaffective disorder, which is a behavioral health disorder associated with mental and emotional symptoms. He explained the basis for his opinion being that she has had suicidal ideation, she was described in bed not being able to communicate under a pile of clothes, her inability to take care of herself, and that her mood was extremely irritable and elevated. Further, she had been reporting psychotic symptoms evidenced by auditory hallucinations, talking to herself,

5

delusional thought processes, and her inability to maintain linear thoughts and follow directions.

He opined that she was a substantial risk of harm to others and others' property. He relied on K.H.'s presentation of paranoid delusions driving her behavior, evidenced by when she attempted to elope multiple times and injured a staff member and when she tried kicking through the door to escape the hospital. He further relied on the mother's testimony that K.H. was generally dysregulated, evidenced by K.H. throwing milk at her mother's car and that K.H. damaged her residence, which is no longer habitable.

He also testified that K.H. was gravely disabled based on the fact she failed to provide for her essential needs of health and safety, due to her urinary tract infection, the ketones found in her urine, the potassium deficiency, and her inability to live in her residence due to the condition of her bathroom and kitchen. Beattey testified that K.H. also was gravely disabled because she was manifesting severe deterioration in routine functioning, as evidenced by the fact her emotions are so dysregulated that she could not function in the community without assistance. Additionally, in the recent past, she had insight into the fact that she needed help with her mental health symptoms by going with her mother to the hospital.

The commissioner found by a preponderance of the evidence that the petitioner satisfied its burden on all four grounds supporting involuntary commitment under RCW 71.05.240. First, the commissioner found that K.H. presented a substantial risk of harm to others "as evidenced by behavior which

6

has caused such harm or which places another person or persons in reasonable fear of sustaining such harm as a result of a mental disorder." It considered the incidents Zimmerman had responded to, including when K.H. swung her notebook at staff, and when one of the staff member's finger was injured as a result of K.H.'s attempted elopement.

Second, the commissioner found that K.H. is a substantial risk of physical harm to the property of others, evidenced by her kicking the hospital door and cutting holes in the wall of her home, as well as the conditions of her bathroom and kitchen, rendering her home uninhabitable.

Third, the commissioner found that K.H. is in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety. K.H.'s home was uninhabitable, she was found under a pile of clothes unable to answer questions, she had ketones in her urine, a potassium deficiency, and her mother was checking on her daily.

Fourth, it found that "the respondent is gravely disabled showing severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over her actions such that, outside the hospital setting, she would not receive care that is essential to her health and safety." The commissioner based its finding on the mother's testimony that K.H. previously had been able to communicate with her, but things continued to get worse over the six-month period leading up to the hearing. She could not take care of her health and safety needs, and she was so dysregulated that she cannot function in the community.

K.H. filed a motion for revision of the commissioner's order. K.H. argued in her motion that the State violated her right to due process by failing to provide formal notice of the facts relied upon to conclude K.H. satisfied the statutory requirements for further involuntary treatment. The trial court denied the motion for revision, adopting all the commissioner's findings. K.H. appeals.[2]

DISCUSSION

K.H. asserts that her due process rights were violated because the State did not provide notice of the substance of the mother's testimony and the laboratory results. Specifically, she asserts the challenged testimony related to the commissioner concluding that K.H. posed a risk of harm to others and property of others, and that K.H. was gravely disabled under RCW 71.05.020(24)(a). She does not challenge K.H.'s commitment on the ground she was gravely disabled under prong (b) of RCW 71.05.020(24).

An essential principle of procedural due process is the right to notice. Morrison v. State Dep't of Labor & Indus., 168 Wn. App. 269, 273, 277 P.3d 675 (2012). The State must comply with due process by providing the individual with sufficient notice of the facts supporting the petition for commitment. In re Det. of R.P., 89 Wn. App. 212, 216, 948 P.2d 856 (1997). The notice provision's purpose is to "apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" In re Det. of Cross, 99 Wn.2d 373, 382, 662 P.2d 828 (1983) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14, 98

---

[2] K.H. also had appealed the commissioner's denial of a motion to dismiss a 90-day commitment petition but has abandoned that issue on appeal because K.H. agreed to an order committing her for 90 days of less restrictive treatment.

S. Ct. 1554, 56 L. Ed. 2d 30 (1978)). To accomplish this, the notice must indicate the issues the State will address at the hearing; only if the notice meets these standards has the affected person received adequate notice protecting their due process rights. Id.

A petition for 14-day involuntary treatment may only be filed in the following circumstance:

> The professional staff of the facility providing evaluation services has analyzed the person's condition and finds the condition is caused by a behavioral health disorder and results in: (a) A likelihood of serious harm; (b) the person being gravely disabled; or (c) the person being in need of assisted outpatient behavioral health treatment; . . . and are prepared to testify those conditions are met.

RCW 71.05.230(1). The petition "shall state the facts that support the finding that such person, as a result of a behavioral health disorder, presents the likelihood of serious harm, or is gravely disabled." RCW 71.05.230(4)(b).

RCW 71.05.240(4)(a) provides the possible grounds on which the court can base a commitment:

> [A]t the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days. . . .

RCW 71.05.020(24) provides the following definitions of gravely disabled:

> "Gravely disabled" means a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and

9

escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

In the instant case, the court committed K.H. based on all four grounds under RCW 71.05.240(4)(a), including both prongs of the gravely disabled statute. However, a single statutory basis is sufficient to support a commitment.

First, K.H. did not timely object to the laboratory results. We may refuse to review any claim of error which was not raised in the trial court. RAP 2.5(a). In order for K.H. to meet RAP 2.5(a) and raise an error for the first time on appeal, she must demonstrate that the error is manifest, and the error is truly of constitutional dimension. State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "Manifest" in RAP 2.5(a)(3) requires a showing of actual prejudice. O'Hara, 167 Wn.2d at 98 (citing State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007)). To show actual prejudice, K.H. must make a plausible showing that the claimed error had practical and identifiable consequences in the trial of the case. Id. at 99 (citing State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). K.H. cannot show actual prejudice because she does not challenge one of the bases, prong (b) under the gravely disabled statute that supports the commitment. Thus, K.H. waives her challenge as to this claim.

The State also contends that K.H. waived her claims as to the mother's testimony because K.H. made a "strategic decision" to wait until the mother had been excused before moving to strike her testimony. Generally, an objection must be made as soon as the basis of the objection becomes known and at a time when the trial judge may act to correct the error. State v. Leavitt, 49 Wn.

App. 348, 357, 743 P.2d 270 (1987) (citing 5K KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 10 (1982).  However, K.H. was not making an evidentiary objection, K.H. was moving to strike testimony based on lack of notice of facts testified to by the mother.  Regardless, we need not determine if the commissioner erred in denying the motion to strike because any such error was harmless.  "'Evidential error is harmless if, without it, the trial court would necessarily have arrived at the same conclusion.'" Matter of Det. of T.C., 11 Wn. App. 2d 51, 59, 450 P.3d 1230, (2019) (quoting Vandercook v. Reece, 120 Wn. App. 647, 652, 86 P.3d 206 (2004)).

Even without the mother's testimony, the record establishes that sufficient evidence supported the three statutory grounds K.H. challenges.  Beattey testified that K.H. had schizoaffective disorder, which is a behavioral health disorder.  First, as to substantial risk of physical harm to others, Zimmerman testified as to four incidents involving K.H.  In one instance, she swung a notebook and was kicking at staff.  In another instance, a doctor was actually harmed as a result of K.H.'s actions—his finger was cut and bleeding—which Beattey also testified to.  As to the substantial risk of harm to the property of others, Zimmerman testified that K.H. kicked and cracked a wooden door at the hospital in her attempt to elope.  Finally, Beattey testified that K.H. was gravely disabled and unable to provide for her health and safety evidenced by the ketones in her urine, her potassium deficiency, and urinary tract infection.  Even if any of the challenged grounds did not support the commitment, K.H. would still

have been committed under RCW 71.05.020(23)(b), which she did not challenge.

We affirm.

_____Cohen, J._____

WE CONCUR:

_____Mann, J._____          _____Andrus, C.J._____