Charles Stephen SANFORD,
Petitioner–Appellee,

v.

**TENNESSEE DEPARTMENT OF EN-
VIRONMENT & CONSERVATION**
and Tennessee Civil Service Commis-
sion, Respondents–Appellants.

Court of Appeals of Tennessee,
Western Section, at Nashville.

Aug. 19, 1998.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 11, 1999.

James G. Stranch, III, and Bryan E.
Pieper, Branstetter, Kilgore, Stranch &
Jennings of Nashville, for Appellee.

John Knox Walkup, Attorney General
and Reporter, Eugenia B. Whitesell, Assis-
tant Attorney General, for Appellants.

CRAWFORD, Presiding Judge, W.S.

This is an appeal from the trial court's
reversal of a final order of the Tennessee
Civil Service Commission (the Commis-
sion). The Commission's final order up-

held Petitioner/Appellee Charles Sanford's termination of employment with the Department of Environment and Conservation (TDEC) based on insubordination. The trial court reversed the Commissioner's order, finding that it was not supported by substantial and material evidence.

The pertinent facts are as follows: Charles Sanford was employed by the Department of Environment and Conservation, Division of Construction Grants and Loans (CGL Division) in 1987. Sanford joined a section of the CGL Division, called the facilities assessment section, in March 1992 and remained there until his discharge in January of 1993. Among its functions, the facility assessment section bi-annually completes a wastewater facility needs survey (Needs Survey) that it submits to the EPA. Sanford's primary job responsibilities during 1992 included assisting with the Needs Survey. He was assigned to work with the other staff and his supervisors to collect information from municipalities in Tennessee regarding wastewater needs and then to submit the information on a computer database in accordance with the EPA's guidelines.

Sanford received an oral warning on April 16, 1992 for insubordination related to his frequent unannounced and unscheduled visits to TDEC Commissioner Luna's office. Prior to 1992 Sanford received two oral warnings for similar conduct, including incidents of abusive language toward his supervisor and a fellow employee. The April 16, 1992 oral warning was followed with a letter dated April 21, 1992, which advised Sanford that he must discontinue the insubordinate behavior or further disciplinary action, up to and including dismissal, would result.

On November 25, 1992, Sanford received a written warning for his continued unprofessional behavior and his habit of spending time on extraneous issues. The written warning relayed an incident where Sanford disobeyed the directions of his supervisor and was "rude, loud, and unpro-

fessional" when questioned on the matter. The written warning also documents that Sanford continued to pursue personal projects at work that were not directly related to his job.

The next incident that promoted punishment occurred on December 17, 1992. Sanford's supervisor, Karen Grubbs (Grubbs), specifically asked Sanford to review data on municipalities for which he was responsible. Sanford refused to do the work stating that he was "working on a proposal for a Joint Resolution for Congress." Although he was specifically told not to pursue that work on state time, he continued to do so. Sanford told his supervisor that she was making him sick and requested annual leave for the rest of the day. The request was denied and Sanford asked for sick leave. The sick leave was approved on the condition that he would go home. Sanford did not go home but, instead, remained in the office. Grubbs reported to Ron Graham (Graham), director of CGL Division, that Sanford was in the office being very disruptive and "wild eyed." Graham had to request that Sanford leave the office.

As a result of the December 17 incident, combined with numerous formal and informal oral and written warnings regarding his insubordination, Grubbs recommended to Jim Poff (Poff), deputy director of the CGL division, and Graham that Sanford be suspended for 3 days for insubordination. A due process hearing was held on December 21, 1992. At the hearing, Sanford did not make any responses to the charges and the suspension was upheld.

Immediately after the hearing, Graham met with Grubbs, Sanford and Poff regarding the Needs Survey. They discussed the importance of completing as much work as possible that day in order to meet the upcoming deadline. After the meeting, Sanford requested to take off the rest of the afternoon. Grubbs denied the leave, but told Sanford he could leave after he finished his assignment specified at the

meeting. Despite her response, Sanford handed the receptionist a leave slip and told her that he was leaving for the rest of the afternoon. Graham attempted to stop Sanford at the elevator and again explained to him the importance of completing the project that day. Graham reminded Sanford of the due process hearing held earlier that day and told Sanford that if he left without approved leave it would result in his termination. Sanford's only response was "Get real," as he got on the elevator and left. Sanford returned later in the day, but he did not explain his previous behavior and refused to tell his supervisors what time he had returned.

As a result of this incident, Grubbs and Graham recommended by memoranda dated December 22, 1992, termination of Sanford's employment based on insubordination. By letter dated December 28, 1992, David Gregory, Assistant Commissioner of TDEC, notified Sanford of the recommendation for termination and notified Sanford that his due process hearing would be held on December 30, 1992. The letter stated in pertinent part:

Attached for your review are your supervisor's and director's reports of an incident which occurred Monday, December 22, [sic] 1992, following your informal hearing for insubordination. The reports describe your response to Karen Grubbs' refusal to grant annual leave after she had discussed the importance of completion of a portion of the Needs Assessment project.

Before the suspension had been decided after the due process hearing for insubordination this morning you again exhibited disregard for direct instructions of your supervisor, Karen Grubbs, and the Division director, Ron Graham, by indicating that you were on leave.

Because of your continued disregard of reasonable work assignments, you are again charged with insubordination and have been recommended for termination.

The supervisors' memoranda recommending termination were attached to the letter. Grubbs's memo contained all the issues relating to the recurring disruptive and insubordinate behavior that kept escalating until his dismissal. She explained how his activities had affected his job performance and specifically noted:

His credibility with the EPA–Region IV and HQ has been severely impaired by his constant refusal to follow guidelines and procedures established for the Needs Survey. EPA HQ personnel have requested that Steve not communicate with HQ staff as TN Needs Coordinator, which presents a hindrance in effectively compiling an accurate estimate of TN Needs. The constant determination to represent information "his way" has caused much of the information to be not included in the EPA report. Over the past year, Steve has been directly insubordinate to me by pursuing activities he was told not to pursue, by not performing assignments as instructed, by not keeping me informed of is whereabouts and activities—even when asked directly. He has also told me I am not his supervisor on several occasions.

Sanford's employment was terminated by letter dated January 19, 1993. Sanford filed a grievance regarding his dismissal and subsequently had a Level IV grievance hearing. By letter dated February 17, 1993, Commissioner Luna upheld the dismissal. Sanford appealed the decision to the Commission, and a hearing was held June 28—30, 1994 and June 25—26, 1995 before an Administrative Law Judge. On August 8, 1995, the Administrative Law Judge entered an Initial Order upholding Sanford's termination on the ground of insubordination. Sanford appealed to the Civil Service Commission (CSC), and the Commission adopted the ALJ's findings. (A copy of the initial order is attached as an addendum to this opinion.)

Sanford filed a petition for judicial review in the trial court. The trial court

reversed the CSC order, finding that the order lacked specificity as to the charge of insubordination and was not supported by substantial and material evidence. The trial court further found that TDEC had failed to comply with T.C.A. § 8–30–331(b)(1) (1993), which entitles an employee to detailed notice of the charges against the employee.

The State appeals the judgment of the trial court and the issues for our review are: (1) whether the trial court erred in ruling that the Civil Service Commission's final order was not supported by substantial and material evidence, and (2) whether the trial court erred in ruling that the Department of Environment and Conservation failed to comply with T.C.A. § 8–30–331(b)(1), as to notice of the charges against him.

■ As to the first issue, the State argues that the administrative record is replete with substantial and material evidence that termination was appropriate based on the incident that occurred on December 21, 1992 and Sanford's behavior prior to this incident. The trial court's review of the Commission's decision is governed by T.C.A. § 4–5–322(h) (Supp.1997), which sets forth the standard of review on appeal of administrative proceedings as follows:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

In *Tennessee Dep't of Human Servs. v. Tennessee Civil Serv. Comm'n,* No. 01A01–9504–CH–00143, 1995 WL 581086 (Tenn.App. Oct.5, 1995), this Court said:

The scope of review in this Court is the same as in the trial court: to review findings of fact of the administrative agency upon a standard of substantial and material evidence. *Humana of Tenn. v. Tenn. Health Facilities Comm'n,* 551 S.W.2d 664 (Tenn.1977); *DePriest v. Puett,* 669 S.W.2d 669 (Tenn. App.1984). Thus, substantial and material evidence is required to sustain the action of an administrative tribunal. *Pace v. Garbage Disposal Dist.,* 54 Tenn.App. 263, 267, 390 S.W.2d 461, 463 (1965). What amounts to "substantial and material" evidence as contained in T.C.A. § 4–5–322(h) is not clearly defined in the statute. Generally, the standard requires "something less than a preponderance of the evidence." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 280 (Tenn.App.1988); *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026 16 L.Ed.2d 131 (1966), "but more than a scintilla or glimmer." *Wayne County,* 756 S.W.2d at 280; *Pace,* 54 Tenn.App. at 267, 390 S.W.2d at 463.

*Tennessee Dep't of Human Servs.,* 1995 WL 581086, at *3.

■ The mandate to the Court is quite explicit that while this Court may consider evidence in the record that detracts from its weight, the court is not allowed to substitute its judgment for that of the agency concerning the weight of the evi-

dence. T.C.A. § 4–5–322(h), *Pace,* 54 Tenn.App. at 266, 390 S.W.2d at 463.

The evidence before the tribunal must be such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Pace,* 54 Tenn.App. at 267, 390 S.W.2d at 463.

■ Under the narrow scope of review set out in T.C.A. § 4–5–322(b), we find that the trial court erred in reversing the Commission's decision to uphold Sanford's termination. Specifically, we find that the Commission was not in error in considering prior incidents of insubordination and disciplinary matters that involved Sanford. Supervisors have the discretion on how to discipline an employee. This Court held in *Tennessee Dep't. of Human Services,* that dismissal is appropriate when a lesser disciplinary action will not end the behavioral problem. *Id.,* 1995 WL 581086, at *4. In the instant case, Sanford had not effectively been performing his job and was disturbing the CGL Division, and previous attempts at discipline had failed. The record before the ALJ and the trial court clearly showed that throughout his employment, Sanford had consistently been warned against insubordinate behavior.

We cannot agree with the lower court's conclusion that the CSC failed to include specific findings concerning the charge of insubordination for his conduct on December 21, 1992. After Sanford attended the meeting with Graham, Poff and Grubbs to discuss the importance of completing the work quickly, he asked for annual leave for the day. Although, his supervisor, Grubbs, denied the leave, Sanford left work anyway. Grubbs notified Graham of Sanford's intentions to leave work. Graham made a second attempt to persuade Sanford to stay as Sanford waited for the elevator. Graham again explained the importance of completing the assignment that day. He further told Sanford that if he left it would lead to his termination. Sanford refused to talk to Graham and

told the receptionist to tell Graham that Graham was bothering him while he was on his own time. His only words to Graham were "Get real" as he got on the elevator to leave. Despite Sanford's contention that he merely went to lunch and returned, he did not inform anyone of this. In fact, he turned in a leave slip for the entire day to the receptionist and told her that he was "gone for the day." Even when Sanford returned to the office later that day, he refused to tell his supervisor when he had returned and offered no explanation for his earlier behavior. Further, Sanford was overheard that afternoon to say that he was working on his own time. Thus, we hold that since previous disciplinary actions had not satisfactorily remedied Sanford's propensity for insubordinate conduct, the ALJ's judgment demonstrates why termination was appropriate based on the December 21, 1992 incident.

■ As to the second issue, the State avers that the December 28, 1992 letter and the attached memoranda provided Sanford with proper notice under T.C.A. § 8–30–331(b)(1) that he was being terminated for his continuous insubordination and that the December 21, 1992 incident was the "straw that broke the camel's back."

■ T.C.A. § 8–30–331(b)(1) provides: 8–30–331. **Minimum due process.—**

\* \* \*

(b) Minimum due process consists of the following:

(1) The employee shall be notified of the charges. such notification should be in writing and shall detail times, places, and other pertinent facts concerning the charges.

Basic due process requires "notice reasonably calculated under all the circumstances, to apprise interested parties" of the claims of the opposing parties. *Mullane v. Central Hanover Bank & Trust*

*Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657 94 L.Ed. 865 (1950). The purpose of due process requirements is to notify the individual in advance in order to allow adequate preparation and reduce surprise. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14, 98 S.Ct. 1554, 1562–63, 56 L.Ed.2d 30 (1978).

The trial court's memorandum refers to the department's letter terminating Sanford's employment. This letter is dated January 19, 1993 and refers to the numerous incidents involving Sanford's insubordination and specifically refers to the informal hearing held on December 30, 1992 before Assistant Commissioner David Gregory. It is important to note that the December 30, 1992 hearing was held pursuant to a notice given in the letter dated December 28, 1992, which included as attachments reports from Sanford's supervisors and directors relating the specific incident of December 22, 1992. The letter explicitly informed Sanford that his supervisors had recommended him for termination based on insubordination. The letter also attached memoranda written by Grubbs and Graham that described the incident on December 21, 1992, when Sanford had been insubordinate and noted a previous pattern of insubordination.

The letter and the memoranda show that Sanford's continued insubordination was considered in the decision to terminate him. The December 28, 1992 letter noted Sanford's "continued disregard of reasonable work assignments" and Grubbs's memorandum stated that Sanford had been insubordinate over the past year. Sanford should have been aware that an explanation for his insubordinate behavior throughout his employment would be necessary. Sanford was provided adequate prehearing notice of the facts which would be presented against him and of the policies which his conduct might be deemed to violate. Thus, we find that the State satisfied the constitutional due process requirements and the specific statutory and regulatory notice requirements.

The judgment of the trial court reversing the Commission's final order is reversed, and the case is remanded for such further proceedings as may be necessary. Costs of appeal are assessed against the appellee.

HIGHERS, and FARMER, JJ., concur.

## APPENDIX

### BEFORE THE TENNESSEE CIVIL SERVICE COMMISSION

IN THE MATTER OF: DEPARTMENT OF ENVIRONMENT AND CONSERVATION v. C. STEVEN SANFORD

DOCKET NO. 26.04-23-0930J

*ORDER*

THIS ORDER IS AN INITIAL ORDER RENDERED BY AN ADMINISTRATIVE JUDGE WITH THE ADMINISTRATIVE PROCEDURES DIVISION.

THE INITIAL ORDER IS NOT A FINAL ORDER BUT SHALL BECOME A FINAL ORDER UNLESS:

1. A PARTY FILED A WRITTEN APPEAL OR PETITION FOR RECONSIDERATION WITH THE ADMINISTRATIVE PROCEDURES DIVISION NO LATER THAN August 18, 1995.

OR

2. THE AGENCY FILES A WRITTEN NOTICE OF REVIEW WITH THE ADMINISTRATIVE PROCEDURES DIVISION NO LATE THAN August 18, 1995.

YOU MUST FILE THE APPEAL, PETITION FOR RECONSIDERATION OR NOTICE OF REVIEW WITH THE *ADMINISTRATIVE PROCEDURES DIVISION.*

THE ADDRESS OF THE ADMINISTRATIVE PROCEDURES DIVISION IS:

SECRETARY OF STATE

ADMINISTRATIVE PROCEDURES DIVISION

SUITE 1700, JAMES K. POLK BUILDING

NASHVILLE, TN 37243–0307

IF YOU HAVE ANY FURTHER QUESTIONS, PLEASE CALL THE ADMINISTRATIVE PROCEDURES DIVISION, (615) 741–7008 OR 741–2078.

\* \* \*

PLEASE CONSULT APPENDIX A AFFIXED TO THE INITIAL ORDER FOR NOTICE OF APPEAL PROCEDURES.

## ORDER

This administrative proceeding was heard on June 28–30, 1994, and January 25–26, 1995, in Nashville, Tennessee, before Robert Fellman, Administrative Judge, assigned by the Secretary of State, Administrative Procedures Division, and sitting for the Tennessee Civil Service Commission. The Grievant, Stephen Sanford, was represented at the hearing by Karen Williams of the Tennessee State Employees Association at the June and January hearings. Thereafter, the Grievant was represented by Michele Collins from Nashville, Tennessee, at the February 21, 1995, deposition of Alice Burke and with submission of the proposed findings. The State was represented by John White and Fran Wallas with the Department of Environment and Conservation. This matter became ready for consideration on May 10, 1995, when both sides filed their replies to the other's proposed findings. The subject of the hearing was the Grievant's termination for insubordination. After consideration of the record and arguments of counsel, it is determined that the termination imposed by the Department of Conservation was appropriate and should be UPHELD. This determination is based upon the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Grievant, Mr. Stephen Sanford, was employed by the Department of Environment and Conservation, Division of Construction Grants and Loans (CGL) until his discharge in January of 1993.

2. Since the '70's, Tennessee participated in a needs survey which was a request from Congress through EPA to assess the country's wastewater needs. The data from the needs survey is used for an allocation formula to determine how much Tennessee would receive. Mr. Jim Poff, currently the deputy director of CGL, has served as the Needs Coordinator for the State of Tennessee since 1986. The Needs Coordinator, Mr. Poff, established the priorities for the collection of data for the needs survey and acted as the contact person for the preparation of the survey. Ms. Karen Grubbs was the manager of the facilities assessment section since October of 1991 and the Grievant's supervisor. The Grievant's job duties related to collecting information from municipalities for the needs survey. The Grievant entered the information into the database with the necessary documentation in order for the data to be acceptable to the federal government.

3. The Grievant received numerous oral warnings for insubordination. Warnings were given for spending countless hours on extraneous matters to the detriment of his work assignments, and failure to get along with coworkers. Mr. Sam Gaddipati, Ms. Grubbs' immediate supervisor, gave him two oral warnings. The first oral warning was given by Mr. Gaddipati when the Grievant was insubordinate to him and told him, "f— you" and walked away. This incident occurred in 1988 or 1989. Mr. Gaddipati told the Grievant that he was giving him an oral warning and further action would be taken if the conduct continued.

4. The Grievant's rude behavior towards other employees was discussed with him. Ms. Grubbs stated on the Grievant's performance evaluation dated February 2, 1990, under the section on communication skills, "I have received two informal complaints from personnel outside the Division (PRT, Personnel) regarding rude telephone manners; ... I have discussed this issue with Mr. Sanford on several occasions, recommending improvements in his presentations and telephone manners." The Grievant was given a marginal rating on his communication skills. The Grievant's performance evaluation dated December 23, 1992, shows that his overall job performance had deteriorated. The Grievant received an overall rating of marginal. The comments by the Grievant's supervisor at the end of the evaluation contain all of the issues relating to the recurring disruptive and insubordinate behaviors that kept escalating until the Grievant's dismissal. The evaluation states that the Grievant "constantly found issues to pursue that were well outside his immediate tasks. He was cautioned by me, dep. dir. and director to curtail his activities and focus his attention on his assigned tasks. His activities have affected his job performance in a number of areas. His effectiveness in obtaining information from co-workers in this and other Divisions has been diminished by his manner of requesting information. His credibility with EPA–Region IV and HQ has been severely impaired by his constant refusal to follow guidelines and procedures established for the Needs Survey. EPA HQ personnel have requested that Steve not communicate with HQ staff as TN Needs Coordinator, which presents a hindrance in effectively compiling an accurate estimate of TN Needs. The constant determination to present information "his way" has caused much of the information to be not included in the EPA report. Over the past year, Steve has been directly insubordinate to me by pursuing activities he was told not to pursue, by not performing assignments as instructed, by not keeping me informed of his whereabouts and activities—even when asked directly. He has also told me I am not his supervisor on several occasions."

5. In September 1990, Mr. Gaddipati and Ms. Grubbs gave an oral warning to the Grievant for being abusive to CGL employee Mr. David Eberling. The Grievant threw work papers and cursed at Mr. Eberling. The Grievant was told not to be "loud, profane or in any way abusive toward anyone while performing his job functions or as an employee of the division." In the written follow-up to the oral warning the Grievant was advised that failure to improve his behavior would lead to further disciplinary action up to, and including, dismissal.

6. The Grievant received an oral warning on April 16, 1992, for insubordination. The Grievant failed to follow his supervisor's instructions for contacting the Commissioner's Office. The Grievant also continued to pursue issues not directly related to his job plan while on State time, and failed to inform his supervisor of his whereabouts and activities. The Grievant's insubordination related to his frequent unannounced and unscheduled visits to the Commissioner's office. Mr. Ron Graham, the Director of CGL testified that on March 22, 1992, he had to call a meeting with Ms. Grubbs, Mr. Poff, and the Grievant because of the Grievant's refusal to go through the chain of command. Mr. Poff testified that even after that meeting, the Grievant went to the Commissioner's unannounced at least two more times. Mr. Poff testified that he had offered to set up a meeting with the Commissioner if the Grievant needed one, but the Grievant wasn't interested.

Mr. Graham and Ms. Grubbs testified that they directed the Grievant to have all correspondence and requests for information reviewed by his supervisor and that the Grievant should go through the chain of command. The Grievant confirmed that he was instructed to have all correspon-

dence go through Ms. Grubbs. Mr. Graham testified that he "needed staff to understand that they did not go to that level to the Commissioner's office, even the assistant commissioner's office on their own about issues." He told the Grievant, "in no uncertain terms, don't go." The Grievant ignored his supervisor's instruction and went back to the Commissioner's office shortly thereafter. The Grievant, himself, testified as follows:

"Q. Did Ms. Grubbs instruct you not to go to the Commissioner's office?

A. Mrs. Grubbs so instructed.

Q. Did you go to the Commissioner's office after she instructed you not to go?

A. Yes, I did."

The Grievant also testified that he continued to go to the Commissioner's office because, "It's much easier in a large organization to start at the top if you don't know what all of these other divisions are." When the Grievant was asked about why he continued to go to the Commissioner's office without telling his supervisor, he testified, "Well, I had already run into the situation where, one, they didn't want me to go; two, they didn't want them to get the documents; and, three, if it went—I'd already seen that if it went through their hands they were going to make editorial changes to it. And I felt like that that was doing a disservice to my reporting the information or trying to communicate."

7. The Grievant ignored his supervisor's and director's instructions and continued to send out correspondence without review. The Grievant testified that he felt his supervisor had "no authority to change my analysis of a problem ... if she was going to start changing the problem around and editing it, then I had to skip her." A letter dated December 15, 1992, was handwritten on State letterhead to Mr. Fitch at EPA in care of Al Gore and the Clinton Transition Team. Ms. Grubbs did not see the letter before it went out. In another instance the Grievant's own memo stated that JWP (Mr. Poff) told him that he "had no business contacting the Attorney General. Despite these instructions, the Grievant testified that he did send the memo to the State Attorney General as well as the U.S. Department of Justice.

8. The Grievant continued to ignore the instructions of his supervisors. On one occasion he requested the word processing center to type a six page memo in a rush. The memo was extraneous to his job assignment. Because of the Grievant's continued insubordination, Ms. Grubbs instructed the Grievant on May 4, 1992, to get prior approval in writing for all word processing requests. Ms. Grubbs told the Grievant "not to take up state time, yours or others, in pursuit of issues that do not directly relate to your job plan activities."

9. The Grievant received another oral warning in May of 1992. Ms. Grubbs testified that the Grievant wanted something out of a secretary's locked drawer. While the secretary's supervisor was getting a key to the drawer, the Grievant forced the drawer open and broke the latch. The Grievant's oral warning was for destruction of state property and behavior unbecoming to a state employee.

10. The Grievant received a written warning on November 15, 1992, for his continued "unprofessional behavior" and his habit of spending time on extraneous issues. The Grievant refused to physically accept the written warning so it was read to him and sent to him by certified mail. The warning related to "disparaging remarks" made to a coworker in an accusatory, and intimidating manner, and remarks made to a city official in an "insistent and threatening" way. The written warning also related to the Grievant's insubordination to his supervisor. Ms. Grubbs and Mr. Poff had instructed the Grievant not to pursue changes to the computer program for the needs survey database. The Grievant disobeyed the directions of his supervisors and filled out a work order for changes to the computer program. When

Ms. Grubbs found the Grievant meeting with Phil Burke (CGL), and Albert Stockell in information systems about making the changes in the computer program, she tried to explain to the employees that the changes were not authorized. The Grievant was "rude, loud and unprofessional" and interrupted Ms. Grubbs repeatedly telling her to "butt out." Mr. Burke described the Grievant as "verbally belligerent." He testified that the Grievant said "two or three times, you know Just F–U; if you don't want to do this Just F–U." Mr. Burke also testified that he witnessed the Grievant refuse to follow his supervisor's instructions.

11. This written warning also documented that the Grievant was continuing to write lengthy papers prepared on State time with State resources but unrelated to the Grievant's job activities. The Grievant had been directed repeatedly not to pursue activities extraneous to his job assignment. The Grievant, himself, made a list of over 40 documents that he wrote which he considered his supervisor might feel were extraneous to his job. The following is a partial listing:

1. Documents on the need for a State Geographic Information System.

2. Document on Spent Nuclear Reactor Fuel.

3. Analysis of Motivation in TN. State Government.

4. Document on the computer usage and cost charge back in state government.

5. Document on bureaucracy in TN. State Government.

6. Document to Commissioner of Personnel on recruiting and training engineers.

7. Memo requesting out-of-state travel to present a paper on lake. management on a lake in China.

8. Letter to Governor on conference attendance and paper presentation.

9. Many memos to the Commissioner and others on the pollution at Oak Ridge.

None of these documents are related to the Grievant's job as shown on his job plan.

12. The written warning had little effect on the Grievant's behavior. Ms. Grubbs testified that, on December 10, 1992, the Grievant stated to her that he could do whatever he wanted to do whenever he wanted to do it. He didn't need to tell her where he was going. He stated that he was getting ready to do something right then and it probably wasn't on State time, so he wasn't going to tell her and left.

13. On December 17, 1992, Ms. Grubbs recommended to Mr. Poff and Mr. Graham that the Grievant be suspended for three days for insubordination. She stated that, "Steve has received numerous formal and informal, oral and written warnings regarding insubordination. He continues to pursue issues not related to his assigned tasks, and has displayed directly insubordinate behavior when directed to perform his assigned function." The recommendation specifically lists a number of lengthy documents prepared and distributed without direction or approval of any supervisors. The Grievant disregarded the instructions of his supervisor and the director of CGL not to pursue extraneous issues and to go through the chain of command. The recommendation for suspension describes the Grievant's refusal to keep his supervisor informed. The Grievant told his supervisor that he would decide when he felt it was relevant to let her know what he was working on. He stated that he would not tell her where he was going or what he was doing since he did not "grant the authority" for Ms. Grubbs to be his supervisor.

14. On December 17, 1992, Ms. Grubbs specifically asked the Grievant at least three times to address the errors on the needs survey. The Grievant refused to do it because he stated that he was "working on a proposal for a 'Joint Resolution' for

Congress". He was specifically told not to pursue that issue on State time. The Grievant sent a handwritten memo to Ms. Grubbs stating, "I cannot accept your suggestion that a manual itemization of errors be made on a multi-giga-byte data-base. That would be absurd, and it shows poor exercise of supervisory authority. Please consider this note as recognition of another technique of 'poor management' by assigning trivial pursuits." A little later, Ms. Grubbs noticed that the Grievant was still not reviewing the one liner of the needs survey as directed. The Grievant told her again that he was working on the Joint Resolution and stated that she was making him sick. Mr. Graham testified that the Grievant came to him and Mr. Poff and said that his supervisor had asked him to do some work on the needs survey that he felt was a waste of time and that he had more important things to do. He told Mr. Graham that his supervisor was making him sick. Then the Grievant requested annual leave for the rest of the day. Ms. Grubbs disapproved the request. When his request was denied, he asked for sick leave. The Grievant wrote on his leave request dated December 17, 1992, "My supervisor is making me sick." CGL had a deadline from EPA to get the information on the needs assessment in as soon as possible. Timely reporting was crucial because the report affected the State's allotment formula.

15. Mr. Graham testified that the Grievant came back to his office shortly thereafter on December 17th, and said he was "John Q. Public" and wanted to meet with him. Mr. Graham had to go to a meeting and agreed to meet with the Grievant when he got back. At about 10 a.m. Ms. Grubbs came to Mr. Graham's office and stated that the Grievant was back in the office being very disruptive and "wild eyed". Mr. Graham requested that the Grievant leave the office. The Grievant's response was, "Well, what are you going to do, have somebody call the police and have

me arrested?" Mr. Graham testified that the Grievant was very disruptive and agitated. He called the division of personnel to ask if he should call the police. By the time he came out of his office the Grievant was gone. The next day. the Grievant stated that he was not going to accept the fact that he was being reprimanded.

16. The Grievant received written notice of the recommendation for suspension and the right to a due process hearing which was scheduled for December 21, 1992. Ms. Grubbs testified at the suspension hearing that the Grievant's acts of insubordination on December 17th brought everything to a head. "This continuing insubordination is such an ongoing problem it affects his job performance, disrupts the staff in general and is requiring an undue amount of time and attention, which takes away from other duties." The suspension was upheld.

17. Just after the hearing, Mr. Graham met with Ms. Grubbs, the Grievant and Mr. Poff and assigned tasks to be done that afternoon. Mr. Poff notified Mr. Graham soon after the meeting that the Grievant turned in a leave slip for the rest of the afternoon. Ms. Grubbs wouldn't approve the leave until the Grievant completed the work assigned.

Ms. Willie Ann Phillips, the secretary, testified, "And I kind of overheard them talking about a leave slip or about him leaving or something of that nature. He came to me and says, Well, she won't sign this, and I'm leaving." The leave slip was for the rest of the afternoon. So I said, "you're not coming back?" "He says, no. So he left." Ms. Grubbs would not approve leave because of the importance of completing a portion of the needs assessment. The Grievant was disregarding the direct instructions of his supervisor and refusing a reasonable work assignment. Mr. Graham found the Grievant at the elevators and explained to him that there was work that had to be completed that afternoon. The Grievant turned toward the receptionist and said, "Would you

please tell him that I'm on my own time and he's bothering me." These statements were made to the Director of the Grievant's division just after a suspension hearing related to the Grievant's previous acts of insubordination. Mr. Graham reminded the Grievant of the hearing they had just had on the Grievant's insubordination and the Grievant said, "Get real." As the Grievant got on the elevator, Mr. Graham said, "If you don't follow directions, if you don't—if you leave without approved leave, which is insubordinate, this is exactly the things I told you would lead to progressive discipline. We're already past suspension. We're past that point. We're to the point where—of our termination: that's the next progressive step and if you leave you're to the point where you can be terminated." Mr. Graham testified that he was pleading with the Grievant. The Grievant again responded, "Get real" as the elevator doors shut. The decision was then made to terminate the Grievant's employment. The Grievant did come back later in the day, but he would not tell his supervisor Ms. Grubbs, Mr. Poff, or Ms. Hughes in the division of personnel what time he returned. Ms. Hughes testified that the Grievant stated at that time that he could not accept Ms. Grubbs as his supervisor. The decision was made to terminate the Grievant's employment based on his insubordination in leaving for the day without approved leave and for not doing the job that he had been assigned to do.

18. On December 22, 1992, Mr. Graham recommended the Grievant be terminated for continuing acts of insubordination. The Grievant was notified of the recommendation for termination and the right to a due process hearing.

19. During his employment with the department, the Grievant ignored the instructions of his supervisors. One example was presented by the testimony of the Grievant. The Grievant testified that he was told "constantly" by Ms. Grubbs that expanded eligibilities was the lowest prior-ity on the needs assessment. He testified' that he "had to almost ignore her on that." The Grievant testified that he considered expanded eligibilities very high and spent "half, maybe thirty-five, forty percent" of his time on expanded eligibilities. Both Mr. Poff and Ms. Grubbs directed the Grievant to address the conventional needs such as sewage treatment facilities of the larger municipalities first. Both Mr. Poff and Ms. Grubbs considered EPA's new category of "expanded eligibilities to be a very low priority. The Grievant ignored his supervisor Ms. Grubbs, the needs coordinator Mr. Poff, and the director of CGL.

20. The Grievant ignored his job assignments as defined by the State and his supervisors. The Grievant testified that the state's "job description plan is irrelevant to the purpose of engineering." He testified that he had "to ignore the job performance plan and help the public. That's why its irrelevant." The Grievant testified that he was not an engineer and did not pass the licensing examination. Nevertheless, he decided to look over the work of other licensed engineers. The Grievant's job in no way involved supervising engineers, The Grievant testified, "As I was going through the documentation that was required for the Needs Survey, I ran into some violations of engineering review. And I would volunteer to remind the engineer that he forgot to review something. It's not something that I wanted to do, and definitely is not something I was assigned."

21. In spite of the previous warnings, the Grievant ignored the directions of his supervisors and continued to send out correspondence without having their required approval. He sent a letter to Mr. Fitch at EPA on October 6, 1992. The Grievant testified that this document was a polished version of a document he testified he did not send. He testified that lie did not send the other document because his supervisor "would have rejected that letter. In fact, I'm sure she rejected that letter."

Nevertheless, the Grievant testified that he sent the polished version.

22. The Grievant presented credible testimony that the supervisory style by Ms. Grubbs could be aggressive, offensive, and overbearing. Clearly there was personality clash between the Grievant and Ms. Grubbs, partially her fault, but mostly the result of the Grievant's own personality quirks.

### CONCLUSIONS OF LAW, DISCUSSION AND POLICY REASONS

1. Tennessee Code Annotated, Section 8–30–326(a) provides that "an appointing authority may dismiss any employee in the authority's division when the authority considers that the good of the service will be served thereby."

2. Rule 1120–10–.07(5)(a) of the Tennessee Department of Personnel provides that "After minimum due process is provided, an employee may be dismissed by the appointing authority from his position for unacceptable conduct or performance of duties.

3. Rule 1120–10–.06(18) provides that the "refusal to accept a reasonable and proper assignment from an authorized supervisor (insubordination)" is an example of a disciplinary offense.

4. Rule 1120–10–.06(4) provides that failure to maintain satisfactory and harmonious working relationships with the public and fellow employees" is an example of a disciplinary offense.

5. The Grievant refused to accept a reasonable and proper assignment from an authorized supervisor after being warned. He refused to do his job as assigned.

6. The Grievant failed to maintain a satisfactory and harmonious working relationship with his fellow employees and supervisors.

7. The Grievant's behavior leading up to his December 21, 1992, hearing and December 22, 1992, dismissal justified more severe discipline. The patience afforded the Grievant does not mean that he was not given progressive discipline; it only means he could have been terminated earlier.

8. The Grievant's attitude was, and remained during the hearing, that he was above supervision. It is clear from the facts, and the Grievant's attitude and demeanor as shown in the hearing, that no discipline short of termination would likely modify his behavior such that he would not be a detriment to the State.

9. For these reasons it is ORDERED that the termination of Grievant, Stephen Sanford, be UPHELD.

This Initial Order entered and effective this 8th day of August, 1995.

/s/ Robert Fellman
Robert Fellman
Administrative Judge

Filed in the Administrative Procedures Division, Office of the Secretary of State this 8th day of August, 1995.

/s/ Charles C. Sullivan, II
Charles C. Sullivan, II, Director
Administrative Procedures Division