# FILED

October 26, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| JUNE Z. WILKINSON, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Appeal No. |
| | ) | 01A01-9808-CV-00446 |
| v. | ) | |
| | ) | Davidson Circuit |
| GRANT R. WILKINSON | ) | No. 97C-1364 |
| | ) | |
| Defendant/Appellee. | ) | |
| | ) | |

## COURT OF APPEALS OF TENNESSEE

## APPEAL FROM THE CIRCUIT COURT
## FOR DAVIDSON COUNTY

### THE HONORABLE BARBARA HAYNES PRESIDING

NICHOLAS D. HARE
500 Church Street
5th Floor
Nashville, Tennessee 37219

ATTORNEY FOR PLAINTIFF/APPELLANT

JOHN J. HOLLINS, SR.
HOLLINS, WAGSTER & YARBROUGH, P.C.
424 Church Street, Suite 2210

Nashville, Tennessee 37219

ATTORNEY FOR DEFENDANT/APPELLEE

**AFFIRMED AND REMANDED**

PATRICIA J. COTTRELL, JUDGE

CONCUR:

CANTRELL, P.J.
CAIN, J.

# OPINION

In this personal injury case, Plaintiff June Z. Wilkinson ("Wife") alleged that her former husband, Defendant Grant R. Wilkinson ("Husband") infected her with Herpes Simplex II. Wife appeals the trial court's decisions to deny her motion for a physical examination under Tenn. R. Civ. P. 35 and grant Husband's motion for summary judgment. For the following reasons, we affirm.

The record shows that the parties married in July 1978. They had two children in 1980 and 1981. In 1984, Wife "began noticing a skin condition." By 1992, the outbreaks had become more severe. In March 1994, a Nashville dermatologist informed Wife that her skin condition was caused by the Herpes Simplex II virus. This diagnosis was made during the pendency of the parties' divorce proceedings.

Convinced that Husband had committed adultery and infected her with the disease, Wife amended her divorce complaint to assert such a claim. Wife moved for an order requiring that Husband submit to a blood test, and the trial court denied that motion. The divorce, which was final in January 1995, was granted to Husband

based upon the inappropriate marital conduct of Wife. The final decree did not mention the issue of the blood test or wife's allegations of infection by Husband.

After the divorce was final, Wife filed a personal injury action, alleging the Herpes-based cause of action. During the pendency of that lawsuit, in December 1995, Husband voluntarily submitted a blood sample for testing at the University of Washington Medical Center Laboratory. The result was negative. Husband's counsel provided the results of that test to Wife's counsel in January of 1996. Wife subsequently filed a motion for physical examination under Tenn. R. Civ. P. 35, requesting that Husband be compelled to submit to another blood test. The court denied that motion on March 29, 1996, and Wife eventually dismissed that lawsuit.

In April 1997, Wife filed the underlying complaint grounded on her contraction of Herpes. The complaint alleged battery, gross negligence, simple negligence, negligent infliction of emotional distress and outrageous conduct arising from her contraction of the disease. Attached to the complaint was the affidavit of a physician who opined that the accuracy of the results of the blood test previously taken by Husband was medically suspect "to the extent that it cannot be reasonably relied upon for the conclusion contained therein that Grant R. Wilkinson is not in fact a carrier of Herpes Simplex Type II."

Husband answered and, in addition to asserting certain defenses, denied that he had Herpes Simplex II virus and denied that he infected Wife with that virus.[1] Husband moved for summary judgment, arguing that blood test he had undergone demonstrated that he did not have, and had never had, Herpes Simplex II. In support of the motion, Husband offered affidavits and deposition excerpts

substantiating the regularity of the blood testing procedures which had been employed as well as explaining the results of the test. Two days after Husband moved for summary judgment, Wife filed a motion for a physical examination of Husband under Tenn. R. Civ. P. 35. She sought a second blood test, arguing that the appearance of impropriety rendered Husband's first test invalid. The trial court denied Wife's motion for a physical examination and granted Husband's motion for summary judgment. Wife appeals.

I.

Wife's expert opined that Wife probably contracted the virus around the time she first experienced the rash and visited a doctor in 1984, although the symptoms had been earlier diagnosed as "zoster" and were first diagnosed as Herpes Simplex II in 1994. The expert further opined that:

> It is my opinion within a reasonable degree of medical certainty, assuming plaintiff did not have the Herpes Simplex Type II virus prior to her marriage to the defendant and that plaintiff was monogamous during her marriage to the defendant, that sexual contact with the defendant was the most likely cause of plaintiff's infection with the Herpes Simplex Type II virus.

However, the expert also specifically discussed a possible, although rare, source of infection other than sexual contact.

Experts for both Husband and Wife agree that a properly conducted blood test which reveals an absence of HSV-II antibodies indicates that the person tested had never acquired the virus and, therefore, could not transmit the infection. They also agree that the Western Blot test, which was the test performed herein, was the most appropriate test to use and that the lab which conducted the blood test in this case was the preeminent, and perhaps only, lab for such testing.

Thus, there is no real dispute in this case as to the effect of the blood test results if those results are valid. Husband will have demonstrated that Wife's claim that he infected her with the virus cannot be maintained. The real dispute herein is whether the results of the blood test can be relied upon because of various procedural irregularities alleged by Wife, related to the taking or handling of the samples or the manipulation of the results and not to the methodology actually employed in the testing.

Wife essentially made two allegations surrounding the blood test: (1) husband manipulated the samples, or at least the possibility exists that he manipulated them, and (2) Husband convinced the head of the University of Washington Medical Center Laboratory to falsify the results of the test. Specifically, she contended that Husband sent the blood sample to the lab himself since the Federal Express mailing labels showed Husband's name and address as the sender, thus raising the specter of tampering. She also suggested irregularity in the fact that a second blood sample had to be taken and sent to the lab since the first sample arrived at the lab in an unlabeled vial. Wife also alleged that the fact that Husband had called the lab in Washington and talked to the doctor in charge of the blood sampling program, Dr. Lawrence Corey, before the samples were sent was suspicious, especially since Husband had lectured at the University of Washington and had performed on-site reviews there related to federal grants. A note in the records of the doctor who examined Husband and had the sample taken, Dr. Denise Buntin, stated that Husband had informed her that he had spoken to Dr. Corey " concerning the necessity for this testing."

Wife's expert opined in her affidavit that:

It is my opinion that there are several aspects of the blood test of defendant by Dr. Denise Buntin and the circumstances surrounding it that do not comport with usual and customary procedure in such a test; specifically: it is unusual for a patient to have personal contact with the doctor in charge of the laboratory which is to perform the analysis of the patient's blood; and is especially unusual for the patient to discuss with that doctor allegations in a lawsuit which bear on the blood analysis to be performed by that doctor; it is unusual for a patient having a blood test to have personal discussion about shipping and handling procedures involved in the blood test with the laboratory which is to perform the analysis of the patient's blood; while it would be completely improper for a patient himself or herself to send their own blood sample to the laboratory which is to perform the analysis of that blood, it is unusual for a patient to be listed as the sender of a blood sample to the laboratory which is to do the analysis of the patient's blood when that patient is not in fact the sender.

In an affidavit offered in support of Husband's motion, Dr. Buntin stated that Husband's blood samples were collected and sent to the lab by her office, although Husband had provided her with containers and Federal Express envelopes listing him as the sender. Dr. Corey submitted an affidavit stating that he did not know Husband, that he did not recall any conversation with him, and that the blood sample was submitted "through routine channels via standard practices."

The record shows that Husband was a pharmacology professor at a local university whose duties had included teaching, research and involvement in therapeutic drug monitoring. Husband testified that he had contacted Dr. Corey six months after Wife filed her first Herpes related claim because he wanted to know how he could clear his name. On only one occasion, he called Dr.Corey because he had heard from a colleague that Dr. Corey was the top authority on such tests. Husband testified that Dr. Corey told him that "it's simple, send a test, okay, if it is

positive you can't tell who gave it to whom, if it's negative you are clean and home free." Husband stated that he told Dr. Corey about his case "only in the vaguest outline" that his former wife had accused him of giving her Herpes.

Later, when Dr. Buntin's office inquired about the mechanics of sending the blood samples to the laboratory, Husband called the laboratory again and spoke to a technical person about transporting the blood sample. Husband also testified that he had never met Dr. Buntin prior to their first appointment. He stated that he met with the doctor, then a nurse technician took his blood, while the doctor remained in the room. He testified that he prepared the Federal Express shipping label and container for Dr. Buntin because she informed him that she did not have containers in which to ship the blood sample and the dry ice required to transport the blood. He paid for the shipping. Husband testified that he handed the empty package to a person in Dr. Buntin's office and had no knowledge of the package from that point. According to Husband, two days later, Dr. Buntin's office informed Husband that the laboratory had refused to process his blood because his name was not on the test tube containing the blood and they needed another blood sample. A technician took the second sample, and Husband did not think he even saw the doctor on his second visit. Husband explained that he had prepared that shipping materials again for sending the blood sample to the lab and provided the cold storage box and the dry ice for the shipment. After the blood was drawn, he left the office.

Dr. Buntin's affidavit included the following:

> The vials of Dr. Wilkinson's blood were sent to the virology laboratory of Dr. Lawrence Corey by my office and not by Dr.

Wilkinson. Dr. Wilkinson did furnish my office with pre-labeled containers to send the blood to the virology laboratory of Dr. Lawrence Corey, but the blood was not sent by him. It was necessary to send two different vials of Dr. Wilkinson's blood to Dr. Corey's laboratory because the first vial that was sent was not labeled with Dr. Wilkinson's name on it. In neither instance did Dr. Wilkinson have access to the blood sample subsequent to its removal from him. . .Dr. Wilkinson's blood was submitted to the virology laboratory in a normal and routine way.

Moreover, Dr. Corey attested that he had no memory of speaking to Husband and that, in any event, Dr. Corey had no influence on how the blood sample was handled or processed. Dr. Corey also indicated that he had never heard Husband lecture and Husband was not a personal friend or acquaintance. Dr. Corey also stated, "Our laboratory is the premier reference laboratory for HSV serological testing and we process all specimens in accordance with all rules and regulations of laboratory practice." He concluded his affidavit with the statement, " Let me assure you that there was in no way any tampering of this laboratory sample after being received at the University of Washington."

## II.

Wife argues that the trial court abused its discretion by denying her motion for physical examination pursuant to Tenn. R. Civ. P. 35. We disagree.

As the movant, Wife had the burden of showing good cause for the second blood test she was requesting.[2] Denials of motions asserted under Tenn. R. Civ. P. 35 are reviewed for abuse of discretion. *See Massengale v. Massengale*, 915 S.W.2d 818, 820 (Tenn. App. 1995). In *BIF, Inc. v. Service Constr. Co., Inc.*, (no appeal number given), 1988 WL 72409 (Tenn. App. July 13, 1988) (no Tenn. R. App. P. 11 application filed) this court discussed the meaning of the abuse of

discretion standard of appellate review and stated:

> The standard conveys two notions. First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen. (internal citations omitted).

*BIF,* 1988 WL 72409 at *2.

The court further stated that, "When the courts refer to an abuse of discretion, 'they are simply saying that either discretion reposed in the lower court judge was not exercised in conformity with applicable guidelines or the decision was plainly against the logic and effect of the facts before the court.'" *Id.* (quoting Waltz, *Judicial Discretion in the Admission of Evidence Under the Federal Rules of Evidence*, 79 Nw. U.L. Rev. 1097, 1101 (1984-85)). The *BIF* court concluded that a trial court's discretionary decisions should be reviewed under a standard which requires us to examine whether (1) the factual basis for the decision is supported by sufficient evidence; (2) the applicable legal principles were correctly identified and applied; and (3) the decision is within the range of acceptable alternatives. *See id*. at *3.

Here, the trial court's decision to deny Wife's motion was grounded on a sufficient factual basis. The affidavit of Dr. Buntin refuted Wife's accusation that Husband had submitted the blood samples to the lab. Dr. Corey's sworn statement countered Wife's claim that Husband had convinced Dr. Corey to falsify the lab's results. Wife presented only the testimony of her expert that certain aspects of the procedures used were "unusual." Husband's testimony explained these purportedly

"unusual" circumstances. His explanations counter each charge of "unusualness" raised by Wife's expert. Here, it appears that Husband, a professional scientist, sought a definitive test from the foremost authority in the field and made inquiries to satisfy himself on the best way to proceed. Husband's testimony makes it clear that he was more familiar with transporting biological samples than Dr. Buntin and therefore prepared the necessary labels and packaging for the shipping of his samples.

Nothing in the record supports Wife's assertions of impropriety. Wife's position would require the trial court to disbelieve the sworn testimony of Dr. Buntin and Dr. Corey in the absence of any colorable evidence contradicting their statements. Having raised the issue of the "unusualness" of certain aspects of the testing procedures, Wife had no further evidence once that "unusualness" was explained to the satisfaction of the trial court. We cannot say that the trial court's decision lacked a sufficient factual basis.

Nor did the trial court misidentify or misapply the appropriate law. The legal test to be applied, as stating in Rule 35, is that an order requiring a party to submit to an examination "may be made only on motion for good cause shown." In the absence of any colorable evidence that the initial test was performed improperly, we cannot agree with Wife that the trial court failed "to recognize the evidentiary dispute as to whether the blood test was done properly." Comments by counsel and by the court during the hearing on Wife's motion clearly demonstrate that the court interpreted the issues and the evidence correctly. Wife stated that her argument that a new blood test should be ordered was based on "the fact that his blood test

was not done by the book." The trial court analyzed the state of the evidence supporting Wife's argument, observing that her argument was based entirely on her expert's affidavit which relied on assumptions that had been refuted by Husband's evidence. In light of the dearth of evidence supporting Wife's argument, we agree that wife did not meet the requisite burden of showing good cause. Thus, the trial court did not misidentify or misapply the applicable law.

Finally, given the state of the evidence, we find the decision was well within the range of acceptable alternatives. Accordingly, the trial court did not abuse its discretion by denying Wife's motion for a physical examination.

III.

Wife states that the denial of her motion for physical examination violated her due process rights. Although she quotes extensively from the state and federal constitutions, Wife offers no argument and never states the reason why this contention requires appellate relief. *See* Tenn. R. App. P. 27(a)(7).

After filing the Rule 35 motion, Wife received proper notice and the opportunity to be heard. *See Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993). Wife does not assert that she was not permitted adequate time to prepare for the impending hearing. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 14, 98 S. Ct. 1554, 1562-63, 56 L. Ed. 2d 30 (1978). At a hearing on the matter, Wife was permitted unrestricted argument and was not prohibited from presenting supporting evidence. *See Phillips*, 863 S.W.2d at 50; *In re Riggs*, 612 S.W.2d 461, 465 (Tenn. App. 1980) ("In litigation between private parties over private rights, it is well-settled that due process of law requires that both notice and an opportunity to be heard be given to necessary parties as to the essentials of a judicial proceeding."); *see also Redd v. Tennessee Dep't of Safety,* 895 S.W.2d 332, 335 (Tenn. 1995). These facts and the absence of any argument explaining this issue preclude us from finding that Wife's due process rights were abridged. The trial court herein simply ruled on a motion allowed by the rules of civil procedure, and we have held that the trial court acted within its discretion. Wife has failed to state a claim for denial of due process.

IV.

Wife maintains that the trial court erred in granting Husband's motion for

summary judgment. She argues that the validity of the blood test remains a disputed issue. Wife's lawsuit is based on her allegation that Husband infected her with the Herpes Simplex II virus. Husband has responded by claiming he could not have so infected Wife because he has never had the virus, as demonstrated by the results of the blood test.

Summary judgment is appropriate only when the movant demonstrates that no genuine issues of material fact remain to be tried, and further shows that, under the undisputed facts, the moving party is entitled to a judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 528 (Tenn. 1998). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmovant, and discard all countervailing evidence. *See id.* at 529. If there is a dispute as to any material fact or any doubt as to the conclusion to be drawn from the evidence, the motion must be denied. *See Dooley v. Everett*, 805 S.W.2d 380, 383 (Tenn. App. 1990). However, a party may prevail on summary judgment by demonstrating that the nonmoving party will be unable to prove an essential element of its case because the failure of proof on an essential element of a claim necessarily renders all other facts immaterial. *See Alexander v. Memphis Individual Practice Ass'n*, 870 S.W.2d 278, 280 (Tenn. 1993); *see also Byrd v. Hall*, 847 S.W.2d 208, 213 (Tenn. 1993). Because these are solely legal determinations, our review of the trial court's ruling on a motion for summary judgment is *de novo* with no presumption of correctness. *See White,* 975 S.W.2d at 528-29.

The record before the trial court at the time of the summary judgment ruling included the results of Husband's blood test which, even according to Wife's

expert, proved conclusively that Husband could not have infected Wife with the virus.[3] Wife presented no evidence to the contrary. Instead, Wife argues that a genuine issue of material fact existed as to the reliability of the test results. Assuming *arguendo* that the material fact at issue is the validity of the test rather than Husband's infection with the disease, Wife's evidence simply does not create a genuine issue.

The evidence submitted by Wife regarding the validity of the blood test result for purposes of the "genuine issue" analysis under the summary judgment standard is the same evidence she presented in support of her Tenn. R. Civ. P. 35 motion. That material is set out earlier in this opinion. Essentially, Wife has presented an expert's affidavit that the testing procedure, as she understood it, included some aspects she deemed "unusual." Husband presented evidence which explained those "unusual" aspects. Husband's evidence dispels the issues of material fact Wife attempted to raise. His explanations counter each charge of "unusualness" raised by Wife's expert. Moreover, the mere fact that a procedure is "unusual" does not of itself raise a disputed issue of fact. Nothing in the record supports Wife's assertions of impropriety, and her suspicions do not create a genuine issue as to the test's validity. Absent some evidence actually raising a disputed issue regarding the validity of the results of Husband's blood tests, we believe summary judgment was appropriate.

The question before the trial court on summary judgment was whether Husband had demonstrated that Wife would be unable to prove an essential element of her claim. Based on the evidence before the trial court, we affirm the grant of

summary judgment to Husband.

Accordingly, the judgment of the trial court is affirmed and this case is remanded for such further proceedings as may be necessary. Costs of this appeal shall be taxed to Appellant, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

CONCUR:


_____
BEN H. CANTRELL,
PRESIDING JUDGE (M.S.)


_____
WILLIAM B. CAIN, JUDGE